EDITH H. JONES, Chief Judge:
Petitioner Elroy Chester (“Petitioner”) confessed and pled guilty to capital murder and was sentenced to death by a Texas *342 jury. His conviction and sentence were affirmed on direct appeal. He sought post-conviction relief from the Texas courts, alleging that he is mentally retarded, and his execution will therefore be unconstitutional. The Texas trial court and Court of Criminal Appeals determined that Chester was not mentally retarded. Petitioner then applied for a writ of habeas corpus via 28 U.S.C. § 2254. The federal district court denied relief, and he now appeals. The state’s legal conclusions neither contradicted nor unreasonably applied federal law, nor were its factual conclusions unreasonable in light of the evidence presented in the state proceedings. See 28 U.S.C. § 2254(d)(1) — (2); Riddle v. Cockrell, 288 F.3d 713, 716 (5th Cir.2002). We therefore AFFIRM.
BACKGROUND
In 1997 and 1998, Petitioner embarked on a criminal spree too long and too gruesome to recount here in its full detail. He perpetrated at least five burglaries and five non-lethal assaults; worse, he left in his wake the victims, ranging from ten to eighty-seven years old, of at least five murders and three rapes. Petitioner’s career as a serial murderer and rapist culminated in the events of February 6, 1998, when his final victim, Willie Ryman III, discovered Petitioner raping his nieces, and Petitioner shot and killed Ryman.
On that evening, Erin DeLeon was at home alone with her small child. After cutting the telephone wires and tampering with the security light between the garage and house, Petitioner entered the house through the unlocked kitchen door, wearing a ski-mask and gloves. With a gun to the back of Erin’s head and her ponytail in his hand, he led her from room to room to retrieve valuables. He then brought her to the living room and ordered her to turn off the lights and draw the blinds. When Claire DeLeon, Erin’s sister, returned to the home with her boyfriend Tim, Petitioner demanded their money and jewelry, then ordered them into the bathroom. Alone again with Erin, he forced her to undress, then blindfolded her with duct tape. He then ordered Tim to return, forced him to strip as well, and restrained him with duct tape. Finally he ordered Claire to enter and strip and blindfolded her with duct tape. He raped Erin and forced other sex acts, holding a gun against her head and threatening to “blow her head off’ if she resisted. He repeated this threat when he forced Clame to perform sex acts.
Willie Ryman III, the DeLeon sisters’ uncle, arrived at this scene with his girlfriend Marcia Sharp, who stayed in the car while Ryman approached the house. Petitioner went to the back door and murdered Ryman with a single shot. He then approached the car, where he began shooting at its locked doors. He fired two more shots into the car before fleeing the scene.
Chester was quickly implicated and captured. He confessed to Ryman’s murder and led police to the murder weapon. Although he lied to the police about where it was hidden, and about the fact that it was loaded, apparently trying to mount a violent escape, he did not succeed. He also confessed to a host of other horrific crimes. After pleading guilty to capital murder, he was sentenced to death by a Texas jury. His conviction and sentence were affirmed on direct appeal. Chester sought post-conviction relief at the state and federal levels on the grounds that he could not be executed because he is mentally retarded. Relying on the United States Supreme Court’s opinion in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the execution of the mentally retarded violates the Eighth Amendment), and on the factors set forth in Ex Parte Briseno, 135 *343 S.W.3d 1, 5 (Tex.Crim.App.2004) (implementing Atkins), the use of which our court has repeatedly blessed, the Texas trial court and Texas Court of Criminal Appeals (“TCCA”) determined that Chester was not mentally retarded. Ex parte Chester, 2007 WL 602607 (Tex.Cr.App. 2007) (unpublished) (“Chester I”).
The TCCA’s detailed and thorough opinion concluded that Chester met two of the three necessary requirements for a finding of mental retardation — significant limitations in intellectual functioning and deficiencies that appeared early in life— but that he did not show “significant deficits in adaptive behavior.” Id. at *3-*4. It cited Briseno for the proposition “that courts should use the definitions of mental retardation as stated by the American Association of Mental Retardation” and for a suggested series of questions which would assist in determining the existence of deficits in adaptive behavior. Id. at *1. It acknowledged that these suggested questions were “intended only to be guidelines for the trial courts” to help them make the mental retardation determination required by Atkins “until the Legislature was to ... establish conclusively both the substantive laws and the procedures that would bring our codes into compliance with the mandate issued by Atkins.” Id. at *3. The legislature had not intervened, however, and so the Briseno factors remained the only legal guidance for lower Texas courts in applying the AAMR definition and determining the presence or absence of “significant deficits in adaptive behavior.” Id.
The TCCA concluded that the trial court’s finding that Petitioner failed to demonstrate significant deficits in adaptive behavior was supported by the evidence. The trial court had heard Petitioner’s evidence regarding his 1987 “Vineland test,” on which he achieved a Vineland Adaptive Behavioral Scales score (1CVABS”) which would typically indicate mild mental retardation. It also, however, heard evidence regarding Chester’s classification during his school years as “learning disabled” (rather than retarded), and found more credible the testimony of a diagnostician who testified that Petitioner’s school records were accurate and that a “learning disability” designation does not imply mental retardation. It also noted the planned nature of Petitioner’s crimes, both the capital crime and other crimes, in which Petitioner took a great many steps to avoid detection. It noted that he acted independently rather than as an accomplice. The trial court considered conflicting testimony regarding Petitioner’s ability to converse coherently, and found more credible the testimony of the expert who testified that Petitioner could converse coherently on a wide range of topics. It found that Petitioner could lie and hide facts to protect himself, as evidenced by his scheme to mislead investigators in order to obtain his loaded gun while in custody. The TCCA therefore affirmed the trial court’s factual finding that Petitioner failed to demonstrate significant deficits in adaptive behavior by a preponderance of the evidence. Id. at *9.
Petitioner then applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, now alleging (as he must) not only his own mental retardation and the resulting unconstitutionality of his sentence, but that the TCCA’s determination was contrary to and an unreasonable application of the holding of Atkins, and that the TCCA’s decision was based on an unreasonable finding of fact in light of the record before it. The federal district court denied relief, and he appealed.
DISCUSSION

I. AEDPA Review

28 U.S.C. § 2254(d) bars relitigation of any claim “adjudicated on the mer *344 its” in state court, subject only to exceptions in Section 2254(d)(1) and (d)(2). Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011). Section 2254(d)(1) contains two overlapping but distinct exceptions: an “unreasonable application” prong and a “contrary to” prong. See Terry Williams v. Taylor, 529 U.S. 362, 404, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). Federal courts may not grant habeas relief pursuant to § 2254(d)(1) “unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). In this context, “clearly established federal law ‘refers to the holdings, as opposed to the dicta, of [the Supreme] Court’s decisions as of the time of the relevant state-court decision.’” Valdez v. Cockrell, 274 F.3d 941, 946 (5th Cir.2001) (quoting Terry Williams, 529 U.S. at 412, 120 S.Ct. at 1523).
Section 2254(d)(2) excepts from the general bar on relief those cases in which the adjudication of the claim “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2). A reviewing federal court presumes that the state court’s factual findings are sound unless the petitioner rebuts the “presumption of correctness by clear and convincing evidence.” Miller-El v. Dretke, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005); Maldonado v. Thaler, 625 F.3d 229, 236 (5th Cir.2010). This standard is demanding but not insatiable; deference does not by definition preclude relief. Miller-El, 545 U.S. at 240, 125 S.Ct. at 2325.
As the Supreme Court has recently reminded, “If [§ 2254(d)’s] standard is difficult to meet, that is because it was meant to be.... It preserves authority to issue the writ where there is no possibility fair-minded jurists could disagree that the state court’s decision conflicts with [the Supreme] Court’s precedent. It goes no farther.” Harrington, 131 S.Ct. at 786 (emphasis added) (internal quotation marks and citation omitted).
Petitioner claims that he is entitled to relief under both 28 U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(d)(2); he asserts that the state court’s adjudication resulted in a decision contrary to and involving an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. We address these claims in turn.

II. Section 2251(d)(1) Claims

A state court’s judgment falls within the “unreasonable application” exception of § 2254(d)(1) if the state court correctly identifies the governing legal principle from the Supreme Court’s decisions, but unreasonably applies it to the facts of the particular case, Busby, 359 F.3d at 713, or where it “ ‘extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.’ ” LaCaze v. Warden of La. Corr. Inst. for Women, 645 F.3d 728, 734 (5th Cir.2011) (quoting Terry Williams, 529 U.S. at 407, 413, 120 S.Ct. at 1520, 1523). A federal court cannot reverse the denial of habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; rather, the court must conclude that such application was also unreasonable. See Horn, 508 F.3d at 313. In fact, “a condition for obtaining habeas corpus from a federal *345 court” is a showing “that the state court’s ruling on the claim being presented ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington, 131 S.Ct. at 786-87 (emphasis added).
The first step in determining whether a state court unreasonably applied clearly established federal law is to identify the Supreme Court holding that the state court supposedly unreasonably applied. See Valdez, 274 F.3d at 946 (citation omitted). In the instant case the relevant holding is that of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
In Atkins, the Supreme Court held that “death is not a suitable punishment for a mentally retarded criminal.” Id. at 321, 122 S.Ct. at 2252. It based this holding on its conclusion that the Eighth Amendment’s meaning is to be drawn “from the evolving standards of decency that mark the progress of a maturing society.” Id. at 311-12, 122 S.Ct. at 2247. To determine what “evolving standards of decency” would dictate in this context, the Court turned to a consideration of “the judgment of legislatures that have addressed the suitability of imposing the death penalty on the mentally retarded[.]” Id. at 313, 122 S.Ct. at 2247. After considering these judgments, the Court stated that “a national consensus” had developed against the imposition of the death penalty on the mentally retarded. Id. at 316, 122 S.Ct. at 2249.
While it found that there was a national consensus opposing the execution of the mentally retarded, the Court acknowledged that there existed disagreement “in determining which offenders are in fact retarded.” Id. at 317, 122 S.Ct. at 2250. In addition, it observed that “[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.” Id. Rather than formulating a rule for what subset of those who claimed to be mentally retarded would be ineligible for the death penalty, the Court left to the states “ ‘the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ ” Id. (quoting Ford v. Wainwright, 477 U.S. 399, 405, 416-17, 106 S.Ct. 2595, 2605, 91 L.Ed.2d 335 (1986)); see, e.g., Hill v. Humphrey, 662 F.3d 1335, 1342, 1360-61 (11th Cir.2011) (en banc) (stating that the United States Supreme Court “did not provide definitive procedural or substantive guides for determining when a person” is mentally retarded and holding that the Georgia Supreme Court did not violate any “clearly established” federal law by upholding Georgia’s reasonable doubt standard for establishing mental retardation).
Petitioner argues that Atkins requires state courts to apply the clinical definitions of mental retardation promulgated by the American Association on Mental Retardation (“AAMR”) and American Psychological Association (“APA”) in evaluating murderers like Petitioner for possible mental retardation. Petitioner relies in particular on footnote 22 of Atkins, which noted, in the course of recounting the perceived national consensus, that state definitions of mental retardation “generally conform ... to the clinical definitions set forth” by the AAMR and APA. Atkins, 536 U.S. at 317 n. 22, 122 S.Ct. at 2250 n. 22. This means the Texas court’s analysis unreasonably applied Atkins’ holding, Petitioner concludes, because he believes the state court analysis does not conform with the AAMR and APA definitions, under which he contends he is retarded.
*346 To evaluate his claim, we turn to the TCCA’s decision and its grounding in Ex parte Briseno, 135 S.W.3d 1 (2004). Petitioner specifically alleges that the TCCA’s reliance on the Briseno factors for determining his retardation, rather than the AAMR definition, was an unreasonable application of and contrary to Atkins. We disagree. It is impossible to conclude that the state court’s analysis here, and its reliance on the factors outlined in Briseno, resulted in a decision that was based on an unreasonable application of Atkins’s holding.
Before Atkins, the Texas legislature determined that to be classified as retarded, a person must prove three facts by a preponderance of the evidence: (a) significantly subaverage general intellectual functioning (proven by showing an IQ below 70) and (b) deficits in adaptive behavior that (c) originated during the developmental period (before age 18). See Tex. Health & Safety Code § 591.003(13). This definition is almost identical to the AAMR definition of mental retardation. The Texas Court of Criminal Appeals adopted the AAMR definition of retardation for death penalty cases in Briseno. 135 S.W.3d at 8.
The Briseno court recognized that the AAMR definition was designed for the purpose of providing social services, not for the purposes of determining whether a person was “so impaired as to fall within the range of mentally retarded offenders about whom there is national consensus.” It also recognized that determining deficits in adaptive behavior (the second element) was highly subjective. Id. at 8. To account for these weaknesses in definition, the Briseno court listed seven factors to flesh out the AAMR definition to determine whether the convict falls within Atkins so as to be protected against the death penalty. The court held:
The adaptive behavior criteria [second element] are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases. There are, however, some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder:
• Did those who knew the person best during the developmental stage— his family, friends, teachers, employers, authorities — think he was mentally retarded at that time, and, if so, act in accordance with that determination?
• Has the person formulated plans and carried them through or is his conduct impulsive?
• Does his conduct show leadership or does it show that he is led around by others?
• Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
• Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
• Can the person hide facts or lie effectively in his own or others’ interests?
• Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?
135 S.W.3d 1, 8 (2004). The Briseno court, in other words, fashioned these evidentiary factors as a means “of developing appropriate ways to enforce the constitutional restriction” set out in Atkins. And on their face, nothing about them contradicts *347 Atkins, as they were developed explicitly to comply with Atkins.[1]
This court has never cast doubt on this approach. To the contrary, in Clark v. Quarterman, 457 F.3d 441 (5th Cir.2006), this court held that “it is not ‘clearly established Federal law as determined by the Supreme Court of the United States’ that state court analysis of subaverage intellectual functioning must precisely track the AAMR’s recommended approach.” 457 F.3d at 445. Clark specifically rejected Petitioner’s argument that “the Texas courts must apply the approach articulated by the [AAMR], which dictates that IQ examiners account for the appropriate confidence band.” Id. If Texas need not follow AAMR procedures when determining subaverage intelligence (a relatively objective determination), then it would be senseless to think Texas must follow AAMR procedures when determining deficits in adaptive behavior (a far more subjective determination).
In light of this court’s previous treatment of the Briseno factors, the Supreme Court’s broad holding in Atkins, and the irrelevance for the purposes of this inquiry of Atkins’ dicta (such as footnote 22), we conclude that the application of the Briseno factors, even in the absence of specific employment of the AAMR’s methodology for determining deficiencies in adaptive behavior, cannot be an “unreasonable application” of Atkins’ broad holding. Atkins clearly did not hold — and Petitioner does not even assert that Atkins held — that states must employ the AAMR or APA definitions of mental retardation, let alone that they must employ the same underlying clinical analysis that the AAMR and APA use to determine which patients meet each prong of those organizations’ definitions; the absence of such a holding is determinative here.
This analysis also disposes of Petitioner’s overlapping argument that the state court decision was “contrary to” clearly established federal law. A state court’s decision is “contrary to” clearly established federal law if “it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.” Busby v. Dretke, 359 F.3d 708, 713 (5th Cir.2004). For the same reasons that employment of the Briseno factors to determine adaptive functioning is not an unreasonable application of Atkins, the Briseno factors themselves do not “contradict” the Supreme Court’s holding in Atkins. See Terry Williams, 529 U.S. at 405, 120 S.Ct. at 1519 (holding state court decision is “contrary” when it “applies a *348 rule that contradicts the governing law set forth in our cases”). This will come as no surprise, since this court has already concluded that the Briseno is not “contrary to” Atkins in precisely this regard. See Woods v. Quarterman, 493 F.3d 580, 587 n. 6 (5th Cir.2007) (“[Petitioner] also argues that Ex parte Briseno, relied on by the state habeas court, is contrary to Atkins in the way it allows courts to evaluate limitations in adaptive behavior .... We find nothing in Briseno that is inconsistent with Atkins in this regard.”).

III. Section 225^(d) (2) Claims

With Section 2254(d)(1) unavailable as a means for obtaining federal habeas relief, Petitioner must rely on Section 2254(d)(2), but ultimately in vain. Section 2254(d)(2) excepts from the section’s general prohibition on habeas relief cases where the adjudication of the claim in state court “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2). The TCCA concluded that Petitioner lacked the deficits in adaptive behavior which, combined with his subaverage intellectual ability,[2] would have yielded the characteristics of mental retardation that render him not morally culpable of a capital crime. Petitioner, on the other hand, argues that the VABS test is dispositive: Under AAMR guidelines, a person with a VABS score of 57 and an IQ test of 69 usually would be classified as mildly mentally retarded. Petitioner argues that the Briseno factors are not adequate tools to determine whether a person is retarded, and that the TCCA’s determination was unreasonable.
We must consider these claims through AEDPA’s discriminating lens, noting that “relief may not be granted unless the decision was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. A factual determination made by a state court must be rebutted by clear and convincing evidence.” Clark, 457 F.3d at 443. “Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).” Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931. As factfinder, the trial court is entitled to deference in credibility determinations. Thompson v. Keohane, 516 U.S. 99, 111, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (quoting Miller v. Fen-ton, 474 U.S. 104, 114, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985)). “The question of whether a defendant suffers from mental retardation involves issues of fact, and thus is subject to a presumption of correctness that must be rebutted by clear and convincing evidence under Section 2254(e)(1).” Maldonado v. Thaler, 625 F.3d 229, 236 (5th Cir.2010).
Accordingly, the state courts’ factual determination is presumed correct unless Petitioner rebuts it with clear and convincing evidence. The state trial court relied on three pieces of evidence to determine that Petitioner had no significant deficits in adaptive behavior:
• Expert testimony stated that Chester could communicate clearly, un *349 derstood current, topical matters, and understood his current legal situation.
• Chester’s criminal spree demonstrated the ability to plan, avoid detection, and lie.
• Chester attempted to escape police custody by lying about the location of the hidden murder weapon so that he could grab it.
Petitioner responds that the Briseno factors and the state’s evidence only focus on recent events (the crimes and recent interviews) as opposed to his full history. Petitioner presented (and represents in his petition) the following evidence:
• The Vineland Adaptive Behavior Survey score of 57. Under AAMR guidelines, this indicates that Chester has deficits in adaptive behavior.
• Expert testimony from Dr. Orloff.
• Testimony from family members that Chester was always “stupid.”
• Testimony from school personnel stating that Chester was stupid or retarded.
• Evidence that Chester enrolled and participated in the Mentally Retarded Offenders Program of the Texas Department of Criminal Justice.
The state trial court found, however, that Petitioner’s evidence was unpersuasive or not credible. It discounted the family and school administrator’s testimony as indicative only of a learning disability, not retardation. Further, the court found that the family had an incentive to lie. Similarly, it found that Dr. OrlofPs testimony was not credible, due to his insufficient exposure to Petitioner and to his lesser credentials. Also, Petitioner’s enrollment in the Mentally Retarded Offenders Program’was not dispositive because official policy allowed non-retarded convicts to participate.
The Texas Court of Criminal Appeals, while acknowledging that test scores alone might have indicated mental retardation, nevertheless was compelled to find that the evidence supported the trial court’s finding that Petitioner is not mentally retarded.[3] Petitioner has offered no “clear and convincing evidence” rebutting the underlying findings or the ultimate finding against mental retardation. While a different factfinder might reach a different conclusion than the state courts, this court only reviews the proceedings .to determine whether Petitioner presented clear and convincing evidence that rebuts the presumption that the state trial court’s determination was correct. § 2254(d)(2), (e)(1). Petitioner failed to do so. Proceedings at the state trial court were a battle between experts with additional testimony and evidence that was inconclusive and invited credibility testing. It is not this court’s place to second-guess the court’s credibility determinations.
This analysis conclusively establishes that § 2254(d)(2) avails Petitioner nothing. *350 But we wish to note a few striking facts from the record that highlight the deficiency of petitioner’s claim that the state courts’ factual findings regarding deficiencies in adaptive behavior were “unreasonable.” Petitioner carefully cased the house of his victims, located the telephone box, cut the telephone wires] entered through an unlocked door (presumably to avoid the noise that would accompany breaking in), disguised himself in a ski mask, and raped/sodomized the two women inside using all the precautions one might expect to see from a clever criminal.
After murdering the girls’ uncle, Petitioner fired his gun into the locked doors of the victim’s car, apparently reasoning that shooting a lock would break it and cause it to fail. This was hardly the work of a person with diminished mental capacity; it was problem-solving in response to a crisis.
Atkins explains:
[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.
536 U.S. at 318, 122 S.Ct. at 2250 (emphasis added). It seems obvious that Petitioner did not act on an impulse, but rather “pursu[ed] a premeditated plan,” acting of his own volition rather than as a “followed ].” Id. Indeed, he masterminded a sophisticated break-in and dealt with a crisis as it developed. Nothing about this crime suggests Petitioner had difficulties “processing] information” or “engaging] in logical reasoning.” Id[4]
Of course, the Petitioner’s burden here is much higher than simply convincing us that Petitioner is not mentally retarded under Atkins. He has to show by clear and convincing evidence that the state court’s determination was unreasonable; he falls far short of this burden.
CONCLUSION
Because the TCCA’s decision was not contrary to or an unreasonable application of clearly established federal law, and because it was not based on an unreasonable factual determination in light of the evidence before it, we AFFIRM the district court’s denial of habeas relief.

. Indeed, the Briseno factors obviously evoke Atkins's language which, in turn, evokes the AAMR findings. The first Briseno factor, regarding developmental stages, ties to the Afkins discussion of the onset of mental retardation before age 18. 536 U.S. at 318, 122 S.Ct. 2242. The second and third, regarding impulsive behavior and leadership, tie to the Atkins note that the retarded “often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.” Id. The fourth, regarding rational actions and social propriety, ties to the Atkins discussion of "understandfing] the reactions of others.” Id. The fifth, regarding focused responses to questions, evokes the Atkins discussion of “diminished capacities to understand and process information, to communicate....” Id. The sixth, concerning the ability to deceive, seems related to Atkins's mention of “capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning.... ” Id. And the seventh, involving forethought and planning, seems tied to Atkins's mention of action "pursuant to a premeditated plan.” Id. The Briseno factors thus are not arbitrary creations of the Texas judiciary but rather carefully constructed considerations that tie directly to Atkins.

. Chester’s IQ tests have resulted in varying numbers, but most of those numbers would qualify him as mentally retarded under the AAMR definition if coupled with deficits in adaptive behavior.

. Petitioner and the dissent repeatedly claim that the state courts relied "solely” on the Briseno factors. The dissent uses this device to assert that the TCCA's decision is "contrary” to Atkins legally. But the TCCA opinion (a) states the proper test, (b) states how the AAMR guidelines are informed by the Briseno factors, and (c) corrects the state habeas court to confirm that Petitioner's diagnostic tests alone usually indicated a diagnosis of mild mental retardation. The court clearly took the test results into account but found them overborne by evidence and credibility determinations of the trial court. This is not "sole reliance” on improper factors but a faithful application of the principle, acknowledged in Atkins itself, that the adaptive functioning component of mental retardation is complex. The dissent would, contrary to Atkins, either prevent the state court from applying its expertise here, or confine the state “solely” to diagnostic test results in debatable cases.

. Petitioner’s other crimes, hilly documented in the state court record and in the TCCA's opinion, further illustrate his cunning criminal calculations. As an example, the murder of John Sepeda — to which Petitioner confessed — similarly involved the cutting of telephone lines leading into a residence’s call box. And before murdering Cheryl DeLeon, Petitioner unscrewed the lightbulb in the outdoor security light. Evidently, Petitioner was able "to abstract from mistakes and learn from experience....” Atkins, 536 U.S. at 318, 122 S.Ct. at 2250.