# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2013

No. 12-70006

Lyle W. Cayce
Clerk

RAMIRO HERNANDEZ, also known as Ramiro Hernandez-Llanas,

Petitioner-Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:08-CV-805

Before SOUTHWICK, HAYNES, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

A Texas state court jury convicted Ramiro Hernandez of capital murder. He was sentenced to death. A federal district court denied his application for habeas relief, which was based in part on the claim that he is mentally retarded.[1] Hernandez was granted a certificate of appealability on that claim,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] The American Psychiatric Association's fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), uses the term "intellectual disability (intellectual developmental disorder)" in place of the term "mental retardation" and de-emphasizes IQ

No. 12-70006

and he also seeks to expand the certificate for three other claims. We AFFIRM the denial of his application and DENY his request to expand the certificate.

PROCEDURAL HISTORY

In 2000, Hernandez was convicted in Texas state court of murdering his employer, Glen Lich. The jury decided that his sentence should be death. In an unpublished opinion, the Texas Court of Criminal Appeals affirmed both his conviction and sentence on direct appeal. *Hernandez v. State*, No. 73,776 (Tex. Crim. App. Dec. 18, 2002). Hernandez then sought habeas relief from the state district court, alleging in part that he was mentally retarded and his execution would violate the Eighth Amendment. After an evidentiary hearing ordered by the Texas Court of Criminal Appeals, the state district court, on May 20, 2008, determined that Hernandez was not mentally retarded. The Court of Criminal Appeals adopted the district court's findings of fact and conclusions of law and denied Hernandez any relief. *Ex parte Hernandez*, No. WR-63282-01, 2008 WL 4151813, at *1 (Tex. Crim. App. Sept. 10, 2008).

In United States district court, Hernandez applied for relief under 28 U.S.C. § 2254. On January 15, 2010, the court stayed the suit to permit exhaustion of state remedies on all unexhausted claims. Hernandez returned to state court and filed his third application for relief, claiming he was denied the right to conflict-free counsel. The Court of Criminal Appeals dismissed his application as an abuse of the writ. *Ex parte Hernandez*, No. WR-63282-03, 2010 WL 1240353, at *1 (Tex. Crim. App. Mar. 31, 2010).

---

scores as determinants of this condition. We are bound by the United States Supreme Court precedent on the legal issue, *Atkins v. Virginia*, 536 U.S. 304 (2002). This court's changing terminology on its own serves little purpose other than to create ambiguity.

No. 12-70006

Returning to federal court, Hernandez claimed that (1) because he suffered from mental retardation, his execution would be unconstitutional; (2) he received ineffective assistance of counsel because of a failure to investigate and present mitigating evidence; (3) his counsel operated under a conflict of interest; and (4) the trial court's admission of documents that detailed a conviction of murder and escape from custody in Mexico was error because the criminal justice system in Mexico did not afford the same rights as were provided in the United States.

In a thorough opinion, the district court denied Hernandez's application, granted a certificate of appealability on his mental retardation claim, and denied a certificate of appealability on all other claims. *Hernandez v. Thaler*, No. SA-08-CA-805-XR, 2011 WL 4437091, at \*59 (W.D. Tex. Sept. 23, 2011). Hernandez appeals the denial of his retardation claim and also seeks a certificate of appealability on his three other claims.

## DISCUSSION

### A. Atkins *Claim of Mental Retardation*

A federal court may grant an application under Section 2254 if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A different standard applies to the review of a state court's factual findings, which we will identify and discuss later.

The district court denied habeas relief after reviewing the state-court records. On appeal, we conduct an independent review and apply the same Section 2254 standards to the state court's decision as did the federal district court. *See Chester v. Thaler*, 666 F.3d 340, 343-50 (5th Cir. 2011).

No. 12-70006

The Eighth Amendment prohibits the execution of a criminal offender who is mentally retarded. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The states are left with "the task of developing appropriate ways to enforce the constitutional restriction." *Id.* at 317.

Post-*Atkins*, the Texas Court of Criminal Appeals defined mental retardation as containing three elements: "(1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004) (citations and quotation marks omitted). The court required "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." *Id.* An IQ of about 70 or below was said to be "significantly subaverage." *Id.* at 7 n.24.

An applicant bears the burden of proving his mental retardation by a preponderance of the evidence. *Id.* at 12. Failure to satisfy even one of the three elements of the *Briseno* definition results in the denial of the claim. *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).

The Court of Criminal Appeals has listed specific evidentiary factors which may be relevant to the analysis of mental retardation. *Briseno*, 135 S.W.3d at 8-9.[1] We have held that the *Briseno* definition and evidentiary factors are not

---

[1] The evidentiary factors listed in *Briseno* are these:

[1] Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?
[2] Has the person formulated plans and carried them through or is his conduct impulsive?
[3] Does his conduct show leadership or does it show that he is led around by

an "unreasonable application" of the Supreme Court's *Atkins* opinion, and neither are the factors "contrary to" clearly established federal law. *Chester*, 666 F.3d at 347-48. Citing *Chester*, Hernandez acknowledges that he does not, indeed cannot, challenge in this court the consistency of the *Briseno* factors with *Atkins*. He does argue, though, that after the state district court cited *Briseno*, it never listed all the factors when considering his habeas petition. His argument is that even though Texas has developed a constitutionally adequate analysis to apply to *Atkins* claims, the state district court unreasonably applied *Atkins* because the court did not fully use the evidentiary factors. Instead, Hernandez claims that the court's consideration of the factors was "one-sided," discussing only those that undermined the claim of retardation. The Court of Criminal Appeals adopted the state district court's factual findings and legal conclusions, so the alleged defect would apply to the appellate decision as well.

This argument, though, is better understood as a challenge to the state district court's consideration of the facts, such as by allegedly examining only part of the evidence. We will consider the completeness of the state district court's application of *Briseno* to the facts in our discussion of the evidence. We conclude now that the state district court decision was neither contrary to nor

---

others?

[4] Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

[5] Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

[6] Can the person hide facts or lie effectively in his own or others' interests?

[7] Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8-9.

involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.

Hernandez also argues that the state court's decision on the merits of his mental retardation claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Because the Texas Court of Criminal Appeals denied Hernandez's habeas application by adopting the state district court's findings and conclusions, we review the state district court's decision. *See Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998). We review the state court's ultimate conclusions, not the state court's opinion that explains its decision. *Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010).

The court will presume that the state district court's findings of fact are correct; the applicant has the burden to rebut that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The relevant opinion by the state district court was on May 20, 2008. The court entitled its decision as "Supplemental Findings of Fact and Conclusions of Law," and it attached as additional, re-adopted findings the court's decision of March 7, 2006, when it initially considered the *Atkins* claim. The court found that Hernandez "was not mentally retarded because the evidence failed to show [he] had a significantly subaverage general intellectual functioning." This finding of fact is entitled to the Section 2254(e)(1) presumption of correctness. We examine the evidence the state court had before it.

At a state court hearing, Dr. Gilbert Martinez, a licensed psychologist, testified that he personally performed neuropsychological evaluations on Hernandez before the punishment phase of the trial in 2000 at a detention

No. 12-70006

facility in Kerr County, Texas, in order to explore Hernandez's cognitive and mental functioning. Dr. Martinez administered a nonverbal portion of the third edition of the Wechsler Adult Intelligence Scale ("WAIS-III"),[2] and Hernandez scored a 54. Dr. Martinez also administered the second edition of the Test of Nonverbal Intelligence ("TONI"), and Hernandez scored a 57 when scaled to American norms.

Another licensed psychologist, Dr. Antonio Puente, evaluated Hernandez while he was incarcerated in 2003. Dr. Puente administered a comprehensive version of the TONI, and Hernandez scored a 52. In 2006, Dr. Puente administered a full-scale version of the WAIS-III, which included verbal testing, and Hernandez scored a 70 when his results were scaled to Mexican norms. Hernandez scored an 87 on the performance portion of the test and a 66 on the verbal portion.

During their testimony, both psychologists referenced an additional TONI given in 1999 by a master's level psychological associate for inmate-screening purposes in the Texas Department of Criminal Justice. Hernandez scored an 83 on this test, but Dr. Puente testified that the test was outdated and not considered reliable.

Neither Dr. Martinez nor Dr. Puente believed Hernandez was intentionally performing poorly on the tests, but Dr. Martinez explained that passive motivational reasons could have caused the below-average scores.

In addition to the psychological examinations, a psychiatrist named Dr. Robert Cantu evaluated Hernandez in 1998 to determine whether he was

---

[2] The United States Supreme Court has described this test as "the standard instrument in the United States for assessing intellectual functioning." *Atkins*, 536 U.S. at 309 n.5.

competent to stand trial. Dr. Cantu diagnosed Hernandez with schizophreniform disorder, the symptoms of which include an impaired perception of reality, but Dr. Cantu ultimately concluded Hernandez was competent to stand trial. The psychiatrist believed Hernandez was "pretending not to understand or not to know in an effort to look bad" and formed a definite opinion that he was intentionally underperforming during his evaluation.

Dr. Michael Arambula, also a practicing psychiatrist, evaluated Hernandez prior to his trial to determine his mental state at the time of the offense. The psychiatrist diagnosed Hernandez as having a mood and thought disorder as the result of drug use and a closed-head injury. The psychiatrist testified he did not see signs that Hernandez was malingering during the evaluation, explaining that a person who is malingering often will give responses that are beneficial to the case; here, Hernandez revealed he was involved in a prison gang, information Dr. Arambula pointed to as an example of what might be unhelpful if presented to a jury.

Another practicing psychiatrist, Dr. Richard Coons, who did not personally interview Hernandez, examined the medical data from the two psychologists' evaluations. Dr. Coons explained that Dr. Puente's WAIS-III examination was the only evidence of a full-scale evaluation for intelligence. After reviewing the examination data and exploring Hernandez's adaptive behavior, Dr. Coons concluded that Hernandez was not mentally retarded.

Dr. Coons was concerned with unexplained inconsistences in the tests' subscores, particularly the disparity between the performance scores of 54 and 87 between the examinations by Dr. Martinez and Dr. Puente. In addition, Dr. Coons testified that some of the tests were incorrectly administered and scored,

potentially causing high-scoring results to be disregarded. He expressed concern that some testing on which Hernandez performed very well was not considered.

Dr. Coons further believed that motivational variables likely played a role in the below-average scores Hernandez received from the two psychologists' examinations, but Dr. Coons did not affirmatively conclude that Hernandez was malingering on the IQ tests.

In addition to considering this evidence on intellectual functioning, the state district court considering the habeas petition also determined "there was no evidence of significant limitations in adaptive functioning" and listed adaptive-skill areas.

In reaching its determinations, the state district court acknowledged the caselaw in *Briseno*. The first *Briseno* factor concerns whether those who knew Martinez in his developmental years thought he was mentally retarded. Family and acquaintances from Mexico testified that he was abused as a child and lived in dangerous conditions near a waste-disposal site. Evidence showed that Hernandez as a child had trouble following directions, frequently fell asleep, received only a third-grade education, did not interact well with other children, could not count money, and appeared to have hygiene difficulties. There was only slight testimony, though, about whether those who knew Hernandez in his youth believed he was mentally retarded at that time.[3]

Regarding the third factor, which involves whether he is a leader or instead is easily led by others, one of Hernandez's sisters testified that he had

---

[3] Hernandez's sister first wrote a statement to the trial court that she did not believe Hernandez was "mentally retarded" but subsequently stated at the state district court's evidentiary hearing that her understanding of that term had changed. She did not disavow her factual testimony, though.

trouble using public transportation. Yet, there was evidence that Hernandez was able to escape from police custody in Mexico and enter the United States where he subsequently gained employment on a ranch in Kerr County, Texas. Another sister explained that she lived in Texas and occasionally visited with Hernandez. She testified that Hernandez did not make much money at his employment on the ranch because he also received room and board in exchange for his services. His sister said she sometimes would take Hernandez to the grocery store, but at other times Hernandez sent others to the store for him.

As for the fourth factor regarding his ability to respond to external stimuli, testimony from Hernandez's relatives provided the state district court with some evidence of irrational responses during his childhood. One example was that Hernandez was shown how to separate different recyclable materials, but he instead placed all the recyclables together. On the other hand, Hernandez was able to request specific types of food during his incarceration because his usual fare was disagreeable.

In regard to the fifth factor, which concerns whether he responds coherently to questions, Dr. Martinez testified that Hernandez would discuss unrelated topics when asked a direct question. Even so, a Texas law-enforcement officer testified that during his post-homicide interview with Hernandez in October 1997, Hernandez received and directly responded to warnings, questions, and requests. The state district court determined that "[t]his was not consistent with the ability and conduct of a person who was mentally retarded."

The second, sixth, and seventh factors involve the ability generally to plan and follow through, to lie or otherwise hide facts, and to use planning and

complex execution in the actual capital offense.  There is evidence to support a finding that Hernandez formulated a plan to murder his employer at the ranch house and carried out that plan.  Hernandez's cousin testified that, two weeks before the murder and while speaking with Hernandez, Hernandez said he was angry with the Liches and wanted to hurt them.  Hernandez also told his cousin that the Liches owned a vehicle that could be sold in Mexico.

The murder victim's wife, Lera Lich, described the events that occurred on the day of the murder.  On the evening of October 14, 1997, the Liches were in their home when Hernandez knocked on the porch door.  Mr. Lich went outside. After a short conversation, the two men walked away from the house.  Then Hernandez killed Mr. Lich by bludgeoning him with a metal bar.  Hernandez returned to the house and raped Mrs. Lich at knife-point.  He told her that she would see Mr. Lich again if she gave Hernandez money.  He bound Mrs. Lich to the bedposts, covered her head with a blanket, and proceeded to steal jewelry. Afterwards, he removed the blanket and insisted on obtaining the keys to the Liches' vehicle. With Mrs. Lich still securely bound, he went outside, started the vehicle, and then turned it off.  He returned, used wire to tighten Mrs. Lich's fastens, and used the telephone. He then untied Mrs. Lich, raped her again, and threatened that he would harm her sleeping mother in the adjoining room if Mrs. Lich called the police.  He then wrapped his arms around her and appeared to fall asleep.  Mrs. Lich was able to break free and find help.  After being arrested by police on October 15, Hernandez provided a false name.

After reviewing the evidence and making detailed findings of fact, the state district court concluded that Hernandez was not mentally retarded.  The court held that (1) "the evidence failed to show that [Hernandez] had a

No. 12-70006

significantly subaverage general intellectual functioning," (2) "there was no evidence of significant limitations in adaptive functioning in any of the [enumerated] skill areas," and (3) "there is no credible evidence that any mental retardation manifested during the developmental period." The court apparently used proposed findings and conclusions submitted by the State. The Court of Criminal Appeals "adopt[ed] the trial court's findings and conclusions and den[ied] the [state habeas] application."

Hernandez argues the persuasiveness of the findings are suspect because the state district judge struck through many of the suggested findings that would explicitly find specific government witnesses more credible than defense witnesses. The judge did not delete all the credibility findings. More importantly, he specifically readopted and attached as an exhibit the findings made two years earlier on these issues. In the 2006 findings, the district judge made choices about the credibility of those expert witnesses and the relevance of their evidence that continued to apply to his reasoning in 2008.

In Texas, a finding of mental retardation may be based in part on an IQ test, but the scores an individual receives "are necessarily imprecise and must be interpreted flexibly." *Clark*, 457 F.3d at 444. "[A] person whose IQ tests below 70 may not be mentally retarded." *Lewis v. Thaler*, 701 F.3d 783, 792 (5th Cir. 2012) (quoting *Briseno*, 135 S.W.3d at 7 n.24).

The Court of Criminal Appeals has "indicated that a full-scale IQ score should provide the basis for any assessment of intellectual functioning." *Maldonado*, 625 F.3d at 240 (citing *Ex parte Hearn*, 310 S.W.3d 424, 431 (Tex. Crim. App. 2010)). Further, the state court may consider testimony from an expert who did not personally administer Hernandez's IQ test. *See Lewis*, 701

No. 12-70006

F.3d at 795. The state court may also "discount . . . scores due to the incentive to malinger." *Taylor v. Quarterman*, 498 F.3d 306, 308 (5th Cir. 2007).

The state district court properly considered more than Hernandez's IQ in determining whether he was mentally retarded. *See Lewis*, 701 F.3d at 792-93. Although his IQ scores were within the range of mental retardation, other evidence undermined the precise accuracy of those scores. When scaled to Mexican norms, Hernandez scored exactly 70 on the *one* full-scale WAIS-III test. Other tests discussed by the state district court either did not evaluate Hernandez's verbal performance or were to be used only for screening purposes. Dr. Coons testified as to his concern about the accuracy of the IQ evaluations because of their administration, particularly pointing out that Dr. Puente did not incorporate sub-tests on which Hernandez scored highly due to the absence of comparative norms. The state district court found that Hernandez's "conversation and communication skills [we]re inconsistent with a diagnosis of mental retardation and decline[d] to find Dr. Puente's [contrary] explanations to be credible." The court reiterated this point in its supplemental findings, noting that "the opinions offered by Dr. Puente as to adaptive behavior are not supported by the evidence"— contrasting them with the contrary opinions of Dr. Coons, which, it found, *were* "supported by the evidence." Evidence further established that Hernandez's motivation to score lower could have been a factor in the test results. Further, the state district court was presented with evidence of Hernandez's adaptive functioning that, the district court found, weighed against a finding of mental retardation.[4] *See Briseno* 135 S.W.3d at 8.

---

[4] Although it did not refer to them as *Briseno* factors, the state district court made detailed findings regarding Hernandez's ability to act rationally, communicate effectively, care for himself, maintain employment, assess right from wrong, follow rules, formulate plans and

No. 12-70006

We disagree with Hernandez that the state court neither examined all the evidence nor applied the *Briseno* factors fairly. The Court of Criminal Appeals adopted the state district court's findings and thereby approved the lower court's credibility choices – some explicit, some implicit – and weighing of the evidence. Though there were significant factual questions about Hernandez's possible mental retardation, Hernandez has not rebutted the presumption of correctness given to the findings by clear and convincing evidence. We cannot conclude that the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). There was no error in the district court's denial of Hernandez's *Atkins* claim based on the finding that he was not mentally retarded.[5]

### B. Motion to Expand the Certificate of Appealability

Hernandez received a certificate of appealability only on his *Atkins* claim. He seeks a certificate on his other claims, which requires that he make "a substantial showing of the denial of a constitutional right." 28 U.S.C. §

---

carry them through, and use deception to further his own interests. The court found that the capital offense and previous offenses involved forethought and planning. It considered his sister's affidavit in which she stated that during Hernandez's childhood years, he "functioned like a person of average intelligence," "[took] care of himself," "bathed and dressed in clean clothes," "had no problem managing his money," "exhibited normal tendencies as to personal hygiene and managing his affairs," "attended school for approximately the same length of time as she did," and "had no problem maintaining employment." It considered affidavits from Hernandez's trial counsel in which Attorney Pickell stated that he did not observe, in his "lengthy and intense involvement with Mr. Hernandez, the significant impairment in memory, judgment and language functioning which Dr. Martinez described"; and Attorney Garcia described Hernandez as functionally capable with average adaptive behavior.

[5] Because of this conclusion, we need not address the arguments as to whether the onset of Hernandez's alleged mental retardation occurred prior to the age of 18.

No. 12-70006

2253(c)(2).  Hernandez must demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation marks omitted).

We examine each of his remaining claims using this standard.

### 1. Ineffective Assistance of Counsel

Hernandez first argues he received ineffective assistance of counsel because his attorneys failed to investigate and present mitigating evidence of Hernandez's childhood during the penalty phase of trial.  To show he was deprived of the right to effective assistance of counsel, Hernandez had to prove (1) his "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Deficiency may exist if counsel failed "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  The issue is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was *itself reasonable*."  *Clark v. Thaler*, 673 F.3d 410, 418-19 (5th Cir.), *cert. denied*, 133 S. Ct. 179 (2012).

Even if Hernandez showed deficient performance, he was also required to prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The state court denied habeas relief on Hernandez's claim that he received ineffective assistance of counsel because of a "failure to properly investigate and present the defenses in the case, as alleged in the Petition."  Consequently, a federal court may not grant habeas relief unless the state court's decision was

15

"contrary to, or involved an unreasonable application of, clearly established Federal law," or the decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). When we apply the standards of both *Strickland* and Section 2254(d) together, our "question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

As an initial matter, Hernandez fails to show how the state court's decision was contrary to federal law or involved an unreasonable application of it. The state court determined, "The applicant was not denied effective assistance of counsel . . . based on the alleged failure of counsel to conduct meaningful mitigation investigation, as the evidence indicates there was a reasonable investigation conducted." That is the correct inquiry. *Clark*, 673 F.3d at 418-19.

Evidence presented to the state district court revealed that Hernandez was personally interviewed by three doctors who learned about his history, including his abusive and deprived childhood. All three experts testified at trial and presented evidence of their evaluations to the jury.

Evidence also showed that counsel employed someone to travel to Mexico and interview Hernandez's mother and two siblings, each of whom provided written declarations. The interviews revealed detailed information about Hernandez's violent childhood circumstances and behavioral abnormalities. His brother stated that Hernandez's counsel never contacted him before trial. His mother declared she did not remember whether counsel called her before the trial began. Yet, Hernandez's sister said counsel spoke with her before trial about whether she could provide information that would help Hernandez, and counsel sought to have Hernandez's mother attend the trial.

Counsel filed an affidavit with the court and explained that both Hernandez's sister and mother refused to attend the trial. Further, counsel did not believe it was in Hernandez's best interest to call his second sister as a witness because she both refused and provided uncomplimentary statements about Hernandez in a previous interview. Counsel's strategy was to use experts to explain Hernandez's behavior instead of excuse it.

Accordingly, we cannot conclude that jurists of reason would debate whether there was a "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788. There is a reasonable argument that *Strickland* was satisfied, and Hernandez has failed to make the requisite showing for a certificate of appealability under 28 U.S.C. § 2253(c)(2).

### 2. Conflict-Free Counsel

Hernandez next argues he was deprived of his right to conflict-free counsel because of his counsel's prior representation of a client whose spouse testified at trial. Hernandez first raised this issue in his third state-habeas petition, which the Texas Court of Criminal Appeals dismissed as an abuse of the writ. The federal district court held that this state procedural default barred his claim, and the court alternatively denied the claim on its merits.

Hernandez must show "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling" and "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack*, 529 U.S. at 478.

A federal court is barred from reviewing a procedurally defaulted claim unless there is "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750

(1991).[6] Hernandez argues that his state-habeas counsel's performance caused the procedural default. In *Coleman,* the Court held that such error "cannot constitute cause to excuse the default in federal habeas" proceedings. *Id.* at 757. The Court has recognized an equitable exception to this rule in cases in which the inmate was legally barred from raising ineffective assistance claims on direct appeal from his state conviction, and counsel was ineffective in the initial state-habeas proceeding. *Martinez v. Ryan*, 132 S. Ct. 1309, 1315, 1320 (2012). The Court recently held that the *Martinez* exception is applicable to Texas inmates who had little practical opportunity to raise ineffective assistance claims on direct appeal, despite not being legally barred from doing so. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013) (overruling *Ibarra v. Thaler*, 687 F.3d 222 (5th Cir. 2012)).

Even after this clarification of *Martinez*, Hernandez's claim fails because he has not shown any actual prejudice to excuse the procedural default. To show "actual prejudice," a petitioner "must establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *see Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000).

A witness testified that she saw Hernandez stab an individual in an encounter that occurred prior to the crime for which Hernandez was being tried. That witness's spouse was initially arrested for the stabbing but was subsequently released from custody after Hernandez took responsibility and

---

[6] Hernandez may also "demonstrate that failure to consider the claims [would] result in a fundamental miscarriage of justice," *id.*, but he forfeited this argument in the district court and on appeal.

No. 12-70006

later pled guilty to the stabbing.  One of Hernandez's attorneys in his capital murder case previously represented the witness's spouse.  Thus, Hernandez argues this former representation prevented his counsel from aggressively challenging the witness's testimony in the capital murder trial.

To prove a Sixth Amendment violation, Hernandez would be required to show "that an actual conflict of interest adversely affected counsel's performance." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000).  An "actual conflict" means counsel was "compelled to compromise his or her duty of loyalty or zealous advocacy." *Id.*  Hernandez must establish an "adverse effect," which may be shown by "evidence that some plausible alternative defense strategy or tactic could have been pursued, but was not because of the actual conflict." *Id.* (quotation marks omitted).

Hernandez's argument fails because he is not able to make the requisite showings and does not establish prejudice for his procedural default.  Applying the underlying standards, Hernandez does not show that he was prepared to recant his responsibility for the stabbing or withdraw his guilty plea for which he was currently imprisoned.  He offers no evidence that counsel did not present admissible evidence or pursue an alternative defense strategy because of an actual conflict. In fact, Hernandez's co-counsel at trial cross examined and impeached the eyewitness's testimony by showing she originally told police she did not see who committed the stabbing.

Accordingly, Hernandez has not shown that jurists of reason would debate the district court's procedural ruling and is therefore denied a certificate of appealability on this claim. *See Slack*, 529 U.S. at 478.

19

No. 12-70006

### 3. Prior Conviction

Finally, Hernandez argues the state trial court erred by admitting documentation of his prior Mexican conviction because such conviction was unreliable. He contends the state district court's explanation for its denial of relief runs contrary to and involved an unreasonable application of Supreme Court precedent. He does not, though, make the required showing that reasonable jurists could disagree with the district court's conclusion that any error was harmless in light of the other admitted evidence that showed he previously committed murder and was imprisoned in Mexico.

The district court's denial of relief is AFFIRMED. Hernandez's motion to expand the certificate of appealability is DENIED.