# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 10–70016

United States Court of Appeals
Fifth Circuit

**FILED**
April 6, 2015

Lyle W. Cayce
Clerk

JOHN REYES MATAMOROS,

Petitioner – Appellant,

v.

WILLIAM STEPHENS, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent – Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, DAVIS, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

A Texas jury found John Reyes Matamoros guilty of capital murder, and the state trial court sentenced him to death. Matamoros sought post-conviction relief on the ground that he is intellectually disabled and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). After the state courts and the federal district court denied him relief, we granted a certificate of appealability (COA). Because Matamoros cannot meet his burden under AEDPA, we AFFIRM the district court's denial of relief.

## I.

The district court's opinion thoroughly recounts the factual background and procedural history of this case. *See Matamoros v. Thaler*, No. H-07-2613,

No. 10–70016

2010 WL 1404368, at \*1–3 (S.D. Tex. Mar. 31, 2010). In November 1992, Matamoros stood trial for the capital murder of his neighbor, Eddie Goebel. The jury found Matamoros guilty, and the state trial court sentenced him to death. The Texas Court of Criminal Appeals affirmed Matamoros's conviction and sentence on direct appeal. *Matamoros v. State*, 901 S.W. 2d 470 (Tex. Crim. App. 1995). The Court of Criminal Appeals denied Matamoros's initial state application for a writ of habeas corpus. *Ex parte Matamoros*, No. 50791-01 (Tex. Crim. App. Dec. 5, 2001). After the Supreme Court decided *Atkins*, Matamoros filed his initial federal habeas petition, asserting that he is ineligible for the death penalty under *Atkins* because he is intellectually disabled.[1] The district court stayed those proceedings so that Matamoros could exhaust his *Atkins* claim in state court.

The Court of Criminal Appeals received Matamoros's successive state habeas application and remanded the case for the state trial court to address the merits of the *Atkins* claim. After an evidentiary hearing, the state trial court entered written findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny relief. The Court of Criminal Appeals denied Matamoros's petition because Matamoros "fail[ed] to demonstrate by a preponderance of the evidence that he has sufficient deficiencies in adaptive functioning for a diagnosis of mental retardation or that there was an onset of mental retardation during [Matamoros's] developmental period." *Ex parte Matamoros*, No. WR-50791-02, 2007 WL 1707193, at \*1 (Tex. Crim. App. June 13, 2007). The state trial court had also found that Matamoros did not meet

---

[1] The terms "mentally retarded" and "mental retardation" are used in this opinion only where they are part of a direct quote. Otherwise, we substitute the terms "intellectual disability" and "intellectually disabled," which have been adopted by the Supreme Court and this circuit to describe the identical condition. *See Hall v. Florida*, 134 S. Ct. 1986 (2014); *Williams v. Stephens*, 761 F.3d 561, 565 & n.1 (5th Cir. 2014).

No. 10–70016

the first criterion for intellectual disability—significant sub-average intellectual functioning—but the Court of Criminal Appeals disagreed and found that Matamoros did meet that criterion. *Id.*

Matamoros then filed the federal habeas petition that gives rise to this appeal. The district court denied relief and denied a COA, concluding that the state court's determination that Matamoros was not intellectually disabled was not unreasonable in light of the evidence before the state court. *Matamoros*, 2010 WL 1404368. Matamoros requested a COA from this court. While the request for a COA was pending, Matamoros moved to stay the proceedings so that he could return to state court to present newly available evidence in support of his *Atkins* claim: in April 2011, Dr. George Denkowski, the psychologist who testified as the state's expert at the state habeas court's 2006 evidentiary hearing, had his license officially "reprimanded" because his "diagnostic practices [had] come under considerable professional scrutiny." *Ex Parte Matamoros*, Nos. WR-50791-02–03, 2012 WL 4713563, at *2 (Tex. Crim. App. Oct. 3, 2012). Denkowski entered into a settlement agreement with the Texas State Board of Examiners of Psychologists, in which he agreed to "not accept any engagement to perform forensic psychological services in the evaluation of subjects for mental retardation or intellectual disability in criminal proceedings." We granted Matamoros's motion to stay the proceedings while he returned to state court to bring this development to the state court's attention.

Following our stay, the Court of Criminal Appeals exercised its authority to reconsider the initial disposition of Matamoros's writ. *Ex Parte Matamoros*, No. WR-50791–02, 2011 WL 6241295, at *1 (Tex. Crim. App. Dec. 14, 2011). The Court of Criminal Appeals remanded the cause to the state trial court "to allow it the opportunity to re-evaluate its initial findings, conclusions, and

recommendation in light of the Denkowski Settlement Agreement." *Id.* The Court of Criminal Appeals stated that the state trial court could "order affidavits or hold a live hearing if warranted." *Id.* In the state trial court, Matamoros tendered new affidavits from Drs. Thomas Oakland and Jack Fletcher in support of his claim of intellectual disability and requested a hearing. Without acknowledging the new affidavits or holding a new hearing, the state trial court signed an order adopting the state's Amended Proposed Findings of Fact and Conclusions of Law, which recommended that relief be denied. The state trial court stated in open court that it had discounted Dr. Denkowski's testimony. *See Ex Parte Matamoros*, 2012 WL 4713563, at \*3 (Price, J., dissenting). The Court of Criminal Appeals again denied Matamoros's writ application, "[b]ased upon the trial court's findings and conclusions and our own review." *Id.* at \*1.

Two judges on the Court of Criminal Appeals dissented. They noted that the state trial court did not mention Matamoros's new affidavits and that "the process by which [the] new recommended findings and conclusions were made does not inspire confidence." *Id.* at \*3. The dissenters further stated that because Matamoros had "made a fairly compelling showing of mental retardation," they "would not reject his claim without first remanding the cause to the convicting court for additional fact development." *Id.* The dissenters specifically stated that they, as the state court, were not bound by "almost insurmountable" AEDPA deference and, for that reason, should not defer to the state trial court's factual determination. *Id.* at \*5.

Matamoros then filed a motion to lift the stay in this court and to remand for the district court "to reconsider [his] *Atkins* claim *de novo* without taking into account or in any respect relying on Dr. Denkowski's analysis." We granted the motion to lift the stay and carried the motion for remand with the

No. 10–70016

request for a COA. *See Matamoros v. Stephens*, 539 F. App'x 487, 491 (5th Cir. 2013). We declined to remand the case to the district court because, "under AEDPA, it is the state trial court's factual findings to which we must defer if reasonable," so "remanding this case to the district court to allow it to make new findings would serve no meaningful purpose." *Id.* at 494. We issued a COA on Matamoros's *Atkins* claim. *Id.* This appeal followed.

## II.

Federal habeas proceedings are subject to the rules prescribed by the Antiterrorism and Effective Death Penalty Act (AEDPA). *See* 28 U.S.C. § 2254. Under AEDPA, if a state court has adjudicated a habeas petitioner's claim on the merits, federal habeas relief may be granted in either of two circumstances. First, relief may be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Harrington v. Richter*, 562 U.S. 86, 97–98 (2011); *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007). "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08 (2002)). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 103.

Second, and of consequence here, relief may be granted if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, we can grant Matamoros's petition if the Court of Criminal Appeals unreasonably found that Matamoros was not intellectually disabled.

5

No. 10–70016

Although "[t]he term 'unreasonable' is no doubt difficult to define . . . , a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (alternation in original) (internal quotation marks omitted). Even if "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (alterations in *Wood*) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). Moreover, we presume the state court's factual findings are correct, and a petitioner only may rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 361 F.3d 849, 854 (5th Cir. 2004), *rev'd on other grounds*, 545 U.S. 231 (2005).[2]

The question of whether a defendant is intellectually disabled is a fact question. *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010). Accordingly, Matamoros bases his argument on § 2254(d)(2). Specifically, Matamoros

---

[2] The Supreme Court has "explicitly left open the question whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)." *Wood v. Allen*, 558 U.S. 290, 300 (2010); *see Rice v. Collins*, 546 U.S. 333, 339 (2006) ("[T]he parties disagree about whether and when [§ 2254(e)(1)'s presumption applies]. We need not address that question."); *see also Wood*, 558 U.S. at 301 n.2 (describing possible ways to interpret the interplay of § 2254(e)(1) and § 2254(d)(2)). The courts of appeals are divided on the issue. *Compare Trussell v. Bowersox*, 447 F.3d 588, 591 (8th Cir. 2006) (applying § 2254(e)(1) in a § 2254(d)(2) case) *with Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004) (holding that § 2254(e)(1) only applies in a challenge based on evidence outside the state trial court record); *see also* Justin F. Marceau, *Deference and Doubt: The Interaction of AEDPA § 2254(d)(2) and (e)(1)*, 82 Tul. L. Rev. 385 (2007).

In our circuit, we apply § 2254(e)(1)'s presumption and "clear and convincing evidence" requirement to a state court's determination of particular factual issues in § 2254(d)(2) cases. *See Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011) ("The clear-and-convincing evidence standard of § 2254(e)(1)—which is arguably more deferential to the state court than is the unreasonable-determination standard of § 2254(d)(2)—pertains only to a state court's determination of particular factual issues, while § 2254(d)(2) pertains to the state court's decision as a whole."); *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).

6

argues that he is entitled to habeas relief because the Court of Criminal Appeals's conclusion that he (Matamoros) is not intellectually disabled is an unreasonable determination of the facts in light of the evidence before that court. *See* 28 U.S.C. § 2254(d)(2). Thus, the question before us is whether Matamoros has shown, by clear and convincing evidence, that the Court of Criminal Appeals unreasonably determined that Matamoros does not exhibit adaptive behavior deficits that originated before age eighteen. We now turn to that task.

### III.

### A.

We begin with a discussion of the law that governs our analysis. In *Atkins*, the Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled persons. 536 U.S. at 321. The Court explained that there is a "national consensus" among state legislatures and Congress that the execution of mentally retarded offenders is excessive punishment, *id.* at 316–17, and the Court found "no reason to disagree with the judgment of the legislatures that have recently addressed the matter," *id.* at 321 (internal quotation marks omitted). The *Atkins* Court noted that states which had already enacted "statutory definitions of mental retardation . . . generally conform to the clinical definitions" of the American Association on Mental Retardation (AAMR) and/or the American Psychiatric Association. *Id.* at 308 n.3, 317 n.22. However, the Court did not articulate a governing standard for intellectual disability, instead leaving to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* at 317 (alteration in original) (internal quotation marks omitted).

No. 10–70016

In Texas, the standard for determining whether a person is intellectually disabled, and thus ineligible for the death penalty, was established by the Texas Court of Criminal Appeals in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). The *Briseno* court looked to the "definitions of 'mental retardation' set out by the American Association on Mental Retardation (AAMR) and [the definition] contained in section 591.003(13) of the Texas Health and Safety Code."[3] *Id.* at 7. Both the AAMR and the Texas Code use a three-prong test for mental retardation: (1) significant sub-average intellectual functioning; (2) deficits in adaptive behavior; and (3) onset before age 18. *Id.* The *Briseno* court held, with qualifications discussed below, that "[Texas] will follow the AAMR or section 591.003(13) criteria in addressing *Atkins* mental retardation claims," unless the legislature adopts an alternative statutory definition for use in capital cases.[4] *Id.* at 8. The *Briseno* court placed the burden of proof on the defendant, who must show, by a preponderance of the evidence, that he is intellectually disabled. *Id.* at 12.

The prong of the *Briseno* test most relevant here is the second prong— deficits in adaptive behavior.[5] "Adaptive behavior means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." *Briseno*, 135 S.W.3d at 7 n.25 (internal quotation marks omitted). The AAMR

---

[3] The subtitle of the Texas Health and Safety Code containing this definition concerns "the effective administration and coordination of mental health and mental retardation services at the state and local levels." Tex. Health & Safety Code Ann. § 531.001.

[4] The Texas Legislature has not adopted such a definition.

[5] The Court of Criminal Appeals determined that Matamoros satisfied the first prong of the *Briseno* test, so we do not discuss that prong here. And because we rule against Matamoros on the adaptive behavior prong, we need not address whether his symptoms onset before age eighteen.

identifies ten adaptive skill areas; a person must have deficits in at least two of these skill areas in order to meet the AAMR diagnostic criteria for adaptive behavior deficits. The ten adaptive skill areas are: "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3 (internal quotation marks omitted).

Although the *Briseno* court stated that Texas courts would use the AAMR definitions, it also noted that "[t]he adaptive behavior criteria are exceedingly subjective." 135 S.W.3d at 8. The *Briseno* court further noted that, "[a]lthough experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether [a] person is, in fact, mentally retarded . . . is one for the finder of fact, based upon all of the evidence and determinations of credibility." *Id.* at 8–9.

Because of the "subjectiv[ity]" of scientific standards and expert testimony, the *Briseno* court listed seven additional factors that courts may consider in their adaptive behavior analysis. These factors have come to be known as "*Briseno* factors." They are:

> (1) Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination? (2) Has the person formulated plans and carried them through or is his conduct impulsive? (3) Does his conduct show leadership or does it show that he is led around by others? (4) Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? (5) Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject to subject? (6) Can the person hide facts or lie effectively in his own or others' interests? (7) Putting aside any heinousness or gruesomeness surrounding the capital

No. 10–70016

offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Id.* We previously have held that *Briseno* is a constitutionally permissible interpretation and application of *Atkins*.[6] *See Lewis v. Thaler*, 701 F.3d 783, 793 (5th Cir. 2012); *Chester v. Thaler*, 666 F.3d 340, 346–47 (5th Cir. 2011). Indeed, we have denied habeas relief even where the state court relied *only* on the *Briseno* factors, to the exclusion of the AAMR adaptive behavior criteria. *See Chester*, 666 F.3d at 347 ("[W]e conclude that the application of the *Briseno* factors, even in the absence of specific employment of the AAMR's methodology for determining deficiencies in adaptive behavior, cannot be an 'unreasonable application' of *Atkins'* broad holding."); *id.* at 353 (Dennis, J., dissenting) ("[T]he TCCA in the present case used the *Briseno* factors as a substantive part of its mental retardation definition, instead of the second prong of the AAMR definition . . . ."). Thus, we are bound to apply the *Briseno* factors in our analysis of whether the state court unreasonably determined that Matamoros is not intellectually disabled.

This is so even in light of the Supreme Court's decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014). Matamoros argued, in a 28(j) letter, that *Hall* casts doubt on the propriety of a test that deviates from accepted medical practice. In *Hall*, the Supreme Court rejected Florida's use of a strict 70-point IQ cut-off, in large part because "Florida's rule disregards established medical

---

[6] Some have criticized the *Briseno* factors because they lack a scientific basis. *See, e.g., Chester v. Thaler*, 666 F.3d 340, 350–71 (5th Cir. 2011) (Dennis, J., dissenting); John H. Blume et al., *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J.L. & Pub. Pol'y 689, 710–14 (2009); *id.* at 711–12 ("The *Briseno* factors present an array of divergences from the clinical definitions."). That said, we may not "disregard the precedent that has been established by our previous decisions." *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 663 (5th Cir. 2012).

No. 10–70016

practice." *Id.* at 1995.  After Matamoros filed the 28(j) letter, we rejected the argument that *Hall* renders *Briseno* unconstitutional.  *See Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015).  Our rule of orderliness prevents a three-judge panel from "disregard[ing] the precedent that has been established by our previous decisions."  *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 663 (5th Cir. 2012).

## B.

Before we turn to the evidence on which the state habeas court based its decision, we pause to discuss the evidence on which it disclaimed any reliance. As noted, Dr. Denkowski was the state's expert witness at the 2006 state habeas proceedings.    Dr. Denkowski administered numerous tests on Matamoros and reviewed affidavits, medical reports, behavioral reports, disciplinary records, and other documents about Matamoros.    Most importantly for present purposes, Dr. Denkowski concluded that Matamoros had an adaptive deficit in functional academics but no other area.  Dr. Denkowski's conclusion was based, in large part, on adjustments he made to Matamoros's scores on the Adaptive Behavior Assessment System (ABAS).  For example, Matamoros attained a 3 out of 10 (i.e., a failing score) on the skill of "self-direction," but Dr. Denkowski adjusted this score upward into the passing range based on Matamoros's "description . . . of his system and plan for stealing cars and . . . [his] documented ability to formulate plans and carry them through, albeit criminal plans."  The state trial court adopted Dr. Denkowski's determination that Matamoros only had an adaptive deficit in functional academics, despite contrary determinations by Matamoros's experts.

No. 10–70016

In 2011, Dr. Denkowski entered into a settlement agreement in which his license was "reprimanded." *See Matamoros*, 2012 WL 4713563, at *1.[7] The Court of Criminal Appeals remanded Matamoros's case "to allow the trial court the opportunity to re-evaluate its initial findings, conclusions, and recommendation in light of the Denkowski Settlement Agreement." *Id.*

On remand, the state trial court disclaimed any reliance on Dr. Denkowski's testimony. However, the state trial court's amended findings of fact closely mirrored its original findings of fact, except that the citations to Dr. Denkowski's testimony were (usually) removed.[8] This similarity between the original and the amended findings exists despite the fact that some of the

---

[7] Dr. Denkowski's testimony and methodology were called into question in at least two other cases in this circuit. *See, e.g.*, *Maldonado v. Thaler*, 389 F. App'x 399, 403 (5th Cir. 2010) (granting COA because the district court's ruling "relied, in part, on the testimony of the State's expert witness, Dr. George Denkowski"); *Pierce v. Thaler*, 355 F. App'x 784, 794 (5th Cir. 2009) (granting COA where petitioner's "arguments focus almost exclusively on . . . the credibility of the State's expert witness, Dr. George Denkowski"). Indeed, the state has taken the position that it will no longer rely on any of Denkowski's findings in any pending appeals.

[8] For example, Finding of Fact 53 states: "The Court finds, based on the 2006 writ hearing, that Dr. Denkowski administered the Stanford-Binet Intelligence Scales – Fifth Edition . . . and the applicant obtained a Full-scale Score of 62 . . . ." Another example is Finding of Fact 64, which states: "The Court finds, based on the 2006 writ hearing, that maladaptive behaviors are behaviors that interfere with the performance of adaptive tasks . . . and that the presence of maladaptive behavior does not meet the criterion of significant limitations in adaptive functioning (I WH at 107–108)(III WH at 72–73)." The citations supporting this Finding of Fact are to Dr. Denkowski's testimony, during which he testified: "[J]ust because you have maladaptive . . . behavior present gives no indication what your adaptive behavior really is . . . [Y]ou can't assess adaptive behavior on the basis of maladaptive behavior." A third example is Finding of Fact 114, in which the state trial court found, "based on the 2006 writ hearing, that Dr. Norsworthy did not assess the applicant's adaptive behavior when evaluating him in 1980; therefore, Dr. Norsworthy's evaluation does not meet the three-prong test required to diagnose mental retardation (I WH at 126–29)(III WH at 71)." The second citation is to Dr. Denkowski's testimony, during which he testified that Dr. Norsworthy "couldn't really make any kind of comment regarding retardation because among other things, no adaptive behavior assessment was done."

amended findings have no support in the record without Dr. Denkowski's testimony. In recognition of this discrepancy, the state acknowledged at oral argument that the state trial court likely relied upon Dr. Denkowski's testimony despite its representations to the contrary.

Matamoros argues that the state trial court's reliance on Dr. Denkowski's testimony makes its decision unreasonable and entitles Matamoros to relief. Matamoros is incorrect. We review the Court of Criminal Appeals's decision, not the state trial court's. *See Woodfox v. Cain*, 772 F.3d 358, 369 (5th Cir. 2014) ("Under AEDPA, we review the last reasoned state court decision." (internal quotation marks omitted)). The Court of Criminal Appeals explicitly stated that it relied not only upon the state trial court's factual findings, but also "[its] own review." *Matamoros*, 2012 WL 4713563, at *1. Thus, Matamoros cannot show that the relevant decisionmaker—the Court of Criminal Appeals—relied on Dr. Denkowski's testimony.

Alternatively, our review is limited to the state court's *decision*, "'not the written opinion explaining that decision.'" *Maldonado*, 625 F.3d at 239 (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)); *see also Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) ("The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning."). Instead, we must conduct our own review of the evidence (excluding Dr. Denkowski's testimony) and determine whether Matamoros has shown clearly and convincingly that the Court of Criminal Appeals's *decision*—that Matamoros did not meet his burden of proof—was unreasonable.

## C.

We now turn to the evidence in the record. Nearly all of the evidence before the Court of Criminal Appeals in 2012 was presented at the 2006

hearing. The evidence presented in 2006 includes: expert testimony from Dr. Susana Rosin; various test results; the transcript of Matamoros's testimony during the punishment phase of his trial; testimony from Matamoros's family members; and records of Matamoros's personal history, particularly those collected while he was under state supervision.[9]

Matamoros offered expert testimony from Dr. Susana Rosin. Dr. Rosin testified that Matamoros was intellectually disabled because he had sub-average intellectual functioning and adaptive behavior deficits that had originated prior to age 18. With respect to the AAMR adaptive skills areas, Dr. Rosin testified that Matamoros had adaptive deficits in communication, writing and math skills, ability to follow directions, living, and ability to adapt to basic rules.

Dr. Rosin based her conclusions on interviews with Matamoros and his family, a review of Matamoros's family records, Texas Youth Commission (TYC) records, Texas Department of Criminal Justice (TDCJ) records, Matamoros's letters, various psychological reports, and Matamoros's test results during his incarceration at TYC.

---

[9] We do not purport to list all of the evidence in the record. Instead, we have attempted to describe enough of the evidence to provide an accurate overview of the record. Moreover, although the Court of Criminal Appeals determined that Matamoros satisfied the "sub-average intellectual functioning" prong of the intellectual disability test, we include some discussion of evidence related to intellectual functioning. As recounted in further detail below, several IQ tests were administered to Matamoros over the past few decades. A 1977 test administered by Dr. Ronald Smith resulted in a full-scale IQ score of 71; a 1980 test administered by Dr. Ludy Norsworthy resulted in a full-scale IQ score of 74; a 2003 test resulted in a full-scale IQ score of 77 (the validity of this test was disputed, as it was based on an outdated test); a 2004 test administered by Dr. Susana Rosin resulted in a full-scale IQ score of 65; and a 2005 test administered by Dr. George Denkowski resulted in a full-scale IQ score of 62 (although Denkowski testified that he did "not believe that is an accurate measure of the applicant's actual mental ability . . . [and] would evaluate the applicant's IQ in the borderline normal range").

No. 10–70016

Based on Dr. Rosin's review of the above-mentioned records, she concluded that:

- The 1977 report diagnosing Matamoros as mildly intellectually disabled appeared to be a valid diagnosis.
- The personality testing in the 1977 report ties into the social behavior analysis that is required for adaptive behavioral analysis.
- The 1977 report is consistent with the information provided by Matamoros's sisters and the description of Matamoros in his other records.
- Matamoros's TYC admission records from June 1978, detailing his work history and family history, and his July 1978 testing placed him—when he was 15—around a second-grade academic level.
- The TYC monthly reports from 1978—which generally described Matamoros as immature—were consistent with Dr. Smith's 1977 report.
- Certain facts in Matamoros's 1979 discharge papers—specifically the statement that he would benefit from learning to fill out an application—were consistent with intellectual disability.
- A 1980 report found that Matamoros was at a 1.8 reading level and 3.7 math level when he was 17 years old.
- Another psychologist, Dr. Ludy Norsworthy, performed an assessment and diagnosed Matamoros with "borderline mental retardation."
- Matamoros's adaptive behavioral problems were apparent in the descriptions of his behavior in his discharge papers from TYC in 1980.
- Intellectual disability tends to run in families and Matamoros has a family history of cognitive and learning problems, including two nephews who display some dysmorphic facial features.

Based on Dr. Rosin's testing of Matamoros, in combination with her review of prior records, Dr. Rosin testified that:

- Matamoros's adaptive behaviors were subnormal, but the test was difficult to administer because Matamoros is in a confined environment and does not have the opportunity to perform some of the tested behaviors.
- Matamoros shows adaptive deficits that he has exhibited since childhood.

15

- Dr. Ronald Smith's 1977 test—which concluded that Matamoros was intellectually disabled—is very significant because it was performed independent of any knowledge about the criminal proceedings.
- Matamoros had deficits in communication, writing ability, and math ability. His deficits were demonstrated by trouble following directions in prison and in learning to adapt to fairly basic rules.

Dr. Rosin testified that personality testing from the time Matamoros was incarcerated as a juvenile indicated that Matamoros was somewhat socially inept, direct, and simplistic in his dealings with others. He was highly group dependent and very easily led into becoming a venturesome participant. He depended highly upon individuals in his group to provide him with leadership and to support him in problem-solving behavior. He also appeared to view adults, particularly males, as a source of punishment.

As part of her evaluation, Dr. Rosin administered the Vineland test, an I.Q. test, the Wechsler Adult Intelligence Scale 3 (W.A.I.S. III), the Wide Range Achievement Test, and the Benton Visual Retention Test, and she attempted to administer the Trail Making A and B test. Based upon the results of the W.A.I.S. III, Dr. Rosin found that Matamoros had a verbal I.Q. of 66, a performance I.Q. of 69, and a full-scale I.Q. of 65.

Dr. Rosin specifically tested Matamoros's adaptive behavior skills through the use of the Vineland test. The Vineland assesses adaptive behavior skills in three areas, which encompass the ten or eleven different areas under the AAMR or DSM, respectively: communications, daily living skills, and socialization. Matamoros scored a 44 in socialization (a moderate deficit), a 33 in communication (a severe deficit), and a 57 in daily living (a mild deficit). Dr. Rosin concluded that Matamoros had deficits in communication, writing and math skills, ability to follow directions, living, and learning to adapt to basic

rules. Based on her own testing, her review of previous tests, and anecdotal evidence from Matamoros's family, Rosin concluded that Matamoros had adaptive deficits originating prior to age 18 and met the criteria for intellectual disability.

In addition to Dr. Rosin's testimony and supporting evidence, Matamoros also presented test-based evidence of intellectual disability. Beginning in 1977, Matamoros was evaluated and administered standardized tests on numerous occasions. In 1977, Dr. Smith administered Matamoros an intelligence test, the W.I.S.C. –R., now the W.I.S.C. –R –IV. He was also administered the Wide Range Achievement Test, the Cattell Culture Fair I.Q. Test, the Bender Gestalt, the Thematical Perception Test, and a number of personality tests. Dr. Smith assessed Matamoros's reading level at about a 1.7 grade equivalency, spelling at about a second-grade equivalency, and arithmetic at a 2.9 grade equivalency. This put Matamoros at about the first percentile in these categories. Dr. Smith's 1977 report assessed Matamoros's verbal I.Q. at 64, performance I.Q. at 82, and full-scale I.Q. at 71. Matamoros's Culture Fair I.Q., based mainly on nonverbal abilities, was a 79.

In 1978—when Matamoros was around the appropriate age for ninth grade—he was administered the Metropolitan Achievement Test (M.A.T.). Matamoros tested around a second-grade level, including a 1.9 in word knowledge; a 1.5 in word analysis; a 1.8 in reading; a 2.4 in math; and a 1.9 in total reading. In 1980, Matamoros was again administered the M.A.T., and he scored a 1.8 in reading and a 3.7 in math. He was also administered the W.A.I.S., the adult version of the Wechsler scales. His verbal I.Q. was 73, his performance I.Q. was 79, and his full-scale I.Q. was 74. In 2003, Matamoros was administered tests by Dr. Walter Quijano. Dr. Quijano found a verbal I.Q. of 72, a performance I.Q. of 84, and a full-scale I.Q. of 77.

No. 10–70016

Turning to the state's case, the state's evidence and argument at the 2006 evidentiary hearing included Dr. Denkowski's testimony, Matamoros's actions after the crime and testimony at his trial, behavior reports from Matamoros's time in state custody, and various criticisms of Matamoros's evidence. For reasons discussed above, we do not consider Dr. Denkowski's testimony.

The state argued that Matamoros's testimony during the punishment phase of his trial was evidence of his ability to think logically, thoughtfully, and rationally. During the punishment phase of his trial, Matamoros took the stand and gave an account that explained the physical evidence placing him at the crime scene (including his blood and shoeprints). Matamoros testified that he and another man, Danny Castillo, were drinking in a parking lot near the victim's house, that Castillo entered the victim's house while Matamoros was urinating behind a car, that Matamoros only entered the victim's house after hearing the victim yelling, that Castillo stabbed Matamoros before fleeing, and that Matamoros stood next to the victim for a moment before leaving. Matamoros further testified that he did not name Castillo as the "true" culprit until the punishment hearing because he feared retribution from Castillo, who was affiliated with the "Mexican Mafia." The state argues that this story "represents a fairly sophisticated attempt to admit incriminating evidence while denying guilt." *Cf. Briseno*, 135 S.W.3d at 8 ("Can the person hide facts or lie effectively in his own or others' interests?"); *id.* ("Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?").

Matamoros also denied that he committed certain offenses for which he previously had been accused or convicted. For example, he maintained that he had not actually committed an assault for which he had pleaded guilty,

18

explaining that he pleaded guilty only because he believed a jury was unlikely to believe his word over the victim's word. Dr. Rosin conceded on cross-examination that Matamoros's explanation "is based on logic and [Matamoros's] understanding of how the criminal justice system worked." *Cf. Briseno*, 135 S.W.3d at 8 ("Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?"). Matamoros further testified that, during his affiliation with the Mexican Mafia, he would be asked to perform certain tasks by other members of the Mexican Mafia, but that he sometimes would decline to perform some of the more violent of those tasks. *Cf. Briseno*, 135 S.W.3d at 8 ("Does his conduct show leadership or does it show that he is led around by others?").

According to the state, Matamoros's crimes "exposed the same calculated rationality as did his testimony." For example, Matamoros had threatened his murder victim the day before the murder, claiming that the victim owed him money. Similarly, the above-mentioned woman whom Matamoros assaulted had previously reported Matamoros for stealing a clipboard from a police car. Four or five months later, Matamoros broke into her house and assaulted her, telling her that "your time has come for you to pay your price." The state argues that both of these crimes evidence Matamoros's ability to make and follow through on plans. *Cf. Briseno*, 135 S.W.3d at 8 ("Has the person formulated plans and carried them through or is his conduct impulsive?"); *id.* at 8–9 ("Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?").

The state also introduced records from Matamoros's time in state custody, including reports from TYC and TDCJ and testimony from correctional officers. These records include descriptions and behaviors

inconsistent with adaptive behavior deficits. For example, some of the reports state that Matamoros was social with other inmates, had the potential to be a leader, and did not have any socialization problems. A 1978 TYC report notes that Matamoros was very proficient at daily living skills, kept himself neat and clean, and was conscientious about his personal appearance. At TDCJ, Matamoros reportedly requested commissary items using the proper forms, successfully completed visitation forms, checked out books from the library, and possessed a chess set and an accompanying list of chess moves (suggesting that he was playing chess with other inmates).

The state also pointed out flaws with the evidence presented by Matamoros. For example, Dr. Rosin's administration of the Vineland test did not comport with accepted methods of administration; rather than asking someone close to Matamoros to answer the questions, she relied on Matamoros's self-reporting. The state also cross-examined Dr. Rosin, with varying degrees of effectiveness, on the following topics: whether Matamoros's inability to follow rules could be the result of an active choice; the fact that many of the TYC reports state that Matamoros was proficient at daily living, polite, and conscientious about his personal appearance; TYC reports that indicate Matamoros was not a behavior problem in class and that he had the potential to become a good leader with good social skills; and TYC reports indicating that Matamoros was manipulative.

The state also attacked the earlier testing and reports. In particular, the state established that neither Dr. Smith nor Dr. Norsworthy tested Matamoros specifically for adaptive behavior deficits, as the presence of adaptive behavior deficits was not a prong of the intellectual disability diagnosis at the times the tests were administered.

No. 10–70016

Matamoros argues that much of this evidence should not be considered because the state trial court "viewed the historical record through Denkowski's skewed lens." Although it is true the state trial court based its decision on much of the same evidence that Dr. Denkowski used (e.g. reports and records from TYC and TDCJ), we cannot say that this evidence is tainted solely because Dr. Denkowski mentioned it. The *Briseno* factors direct courts to evaluate a defendant's interactions with others and ability to function in everyday life; under our precedent, courts can conduct that inquiry by referring to records of the defendant's daily life or by examining his testimony. *See, e.g.*, *Maldonado*, 625 F.3d at 241–44. In any event, we review the Court of Criminal Appeals's decision, not the state trial court's.

**D.**

In addition to all of the evidence presented at the 2006 evidentiary hearing, Matamoros submitted new affidavits in 2012 from Drs. Jack Fletcher and Thomas Oakland. The affidavits, which are described in greater detail below, are generally critical of the state trial court's 2006 decision, of Dr. Denkowski's methodology, and of the use of TYC records as a measure of adaptive behavior competency. It is unclear whether the state trial court or the Court of Criminal Appeals considered the affidavits of Drs. Fletcher and Oakland.

Dr. Fletcher's affidavit criticizes Dr. Denkowski's methods; Dr. Fletcher "do[es] not believe that Dr. Denkowski utilizes accepted practices . . . and [believes] that Dr. Denkowski interprets assessment data in an idiosyncratic manner that is professionally unacceptable and unethical." Further, Dr. Fletcher states that "Dr. Denkowski's practice of adjusting adaptive behavior scores based on 'trial testimony,' reports of behavior in controlled settings like the Texas Youth Commission and prison, and evidence of a 'criminal

21

personality' is inappropriate." Dr. Fletcher, based on his own review of Matamoros's history, determined that "there are clear indications from caretakers of significant adaptive behavior deficits before age 18," and that "[Matamoros] shows evidence of adaptive behavior weaknesses in conceptual, social, and practical domains consistent with a mild intellectual disability. Both the intellectual deficiencies and the adaptive behavior deficiencies were apparent during the developmental period (i.e., before 18 years of age)." Dr. Fletcher concludes that Matamoros "meets the criteria for an intellectual disability."

Dr. Oakland submitted two affidavits. The first sharply criticizes Dr. Denkowski's testimony and findings. For example, Dr. Oakland states that "Dr. Denkowski's reliance on Mr. Matamoros's anti-social and criminal behavior as evidence of his adaptive behavior is unsupported and contrary to standard practice. Moreover, his belief that measures of adaptive behavior produce scores that tend to understate the actual functioning of persons engaged in criminal behaviors also is contrary to standard practice and lacks empirical support." The affidavit further states that Dr. Denkowski inappropriately relied on records from when Matamoros was incarcerated, explaining that "[l]ife when incarcerated, by design, differs considerably from life on the outside. Life on the outside has more common life demands, is more complex, and more reliant on one personally knowing what to do, when, and under what conditions." Dr. Oakland ultimately concludes that, based upon his "review of Dr. Denkowski's affidavit and testimony, it [is] my opinion that . . . Dr. Denkowski's work concerning adaptive behavior deficit, in this case, reflects a lack of adherence to well established standards and practices and violates ethical standards."

No. 10–70016

Dr. Oakland's second affidavit takes issue with the state trial court's findings of fact in the 2006 proceeding. In particular, Dr. Oakland writes that "the judge's findings display a lack of understanding of well-established standards and principles as well as scientific value." The affidavit then proceeds to criticize approximately seventy of the state trial court's factual findings. For example, with respect to the state trial court's 2006 Findings of Fact 75 and 83, Dr. Oakland opined: "The judge erred in her judgment as to the behaviors that reflect adaptive behavior. She commonly and incorrectly assumes such qualities as "*appeared to clearly understand, is logical, addressed questions appropriately, is capable, devise stories, provide a rational explanation, shows understanding*, . . . reflect adaptive behavior. They reflect intelligence, not adaptive behavior."

The parties dispute whether we may consider these affidavits. AEDPA limits our review to "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Although Matamoros *submitted* the affidavits to the state trial court, it is unclear whether the state court ever accepted this submission. As noted, the Court of Criminal Appeals allowed the state trial court "the opportunity to re-evaluate its initial findings, conclusions, and recommendation in light of the Denkowski Settlement Agreement." *Matamoros*, 2011 WL 6241295, at *1. The Court of Criminal Appeals stated that the state trial court could "order affidavits or hold a live hearing if warranted," *id.*, but it did not require the state trial court to accept new affidavits. The state trial court did not give any indication that it had reviewed the new affidavits. Thus, we cannot say whether the affidavits were "presented in the State court proceeding." Indeed, the dissenting judges of the Court of Criminal Appeals wrote that the state trial court "apparently did *not*" consider the affidavits. *Matamoros*, 2012 WL 4713563, at *3 (Price, J., dissenting)

23

No. 10–70016

(emphasis in original). And it is unclear whether the Court of Criminal Appeals considered the affidavits when it conducted "[its] own review" of the evidence.

In any event, the affidavits do not affect the outcome of this appeal. Even if the state trial court was properly presented with the affidavits' criticism of using TYC records to gauge Matamoros's adaptive functioning, the state trial court would not have been required to give those criticisms determinative (or any amount of) weight. *See Briseno*, 135 S.W.3d at 8–9 ("Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether [a] person is, in fact, mentally retarded . . . is one for the finder of fact, based upon all of the evidence and determinations of credibility."). Accordingly, even if the affidavits were in the record, we would not be able to say that the state trial court's reliance on the TYC records was unreasonable.[10]

**IV.**

Oftentimes, the precise standard of review has little practical effect on the outcome of a case. Courts often comment that they "need not address" the standard of review, *Rice v. Collins*, 546 U.S. 333, 339 (2006), that the result is the same "[w]ith or without . . . deference," *Smith v. Spisak*, 558 U.S. 139, 156 (2010), that "we need not parse the differences between the two standards in this case," *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1445 (2014), or that a claim can be rejected "[u]nder any standard of review," *Quilloin v. Walcott*, 434 U.S. 246, 256 (1978). This is not one of those cases. The law permits us to grant relief only if Matamoros has shown, by clear and convincing

---

[10] In addition, the portions of the affidavits criticizing Dr. Denkowski are irrelevant, as we have not given any weight to Dr. Denkowski's testimony or opinions.

24

evidence, that the Court of Criminal Appeals was unreasonable in concluding that Matamoros failed to prove, by a preponderance of the evidence, that he is intellectually disabled, as that term is defined in *Briseno* and has been interpreted by Texas courts.

Under that standard, Matamoros's petition fails. Although Matamoros provided ample evidence that he exhibits adaptive behavior deficits—including multiple test results, multiple expert opinions, and multiple diagnoses spanning three decades—and although the state has no expert testimony in support of its position,[11] instead relying primarily on historical and observational evidence, Matamoros has not shown that the Court of Criminal Appeals was unreasonable in concluding that Matamoros did not meet his burden. Under *Briseno*'s framework, the Court of Criminal Appeals was free to weigh the historical and observational evidence and its interpretation of Matamoros's testimony more heavily than it weighed the scientific and expert reports presented by Matamoros. As we have recounted, the record contains evidence that Matamoros has formulated plans, has shown the potential for leadership, responds appropriately to external stimuli, answers questions directly, lies to protect his own interests, and has committed offenses requiring forethought. *See Briseno*, 135 S.W.3d at 8–9. Moreover, the state used cross-examination to cast some doubt on Dr. Rosin's methodology and findings, as well as those of other doctors who examined Matamoros. Thus, even though the only competent scientific evidence in the record suggests that Matamoros has deficits in numerous adaptive behavior areas, Matamoros has not clearly and convincingly shown that it was unreasonable for the Court of Criminal Appeals to conclude that Matamoros did not satisfy the *Briseno* test for

---

[11] Other than Dr. Denkowski's testimony.

## No. 10–70016

adaptive behavioral defects. *Cf. Mays*, 757 F.3d at 219 ("[B]ecause Mays has made no attempt to present any evidence of limited adaptive functioning under *Briseno*, he has failed to provide evidence of mental retardation under Texas law . . . ."). Accordingly, we AFFIRM the district court's denial of relief.