# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 1, 2019

Lyle W. Cayce
Clerk

No. 18-70034

KER'SEAN OLAJUWA RAMEY,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CRIMINAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, HIGGINSON, and DUNCAN, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Ker'Sean Olajuwa Ramey ("Ramey"), a Texas inmate convicted of capital murder and sentenced to death, filed a federal petition for a writ of habeas corpus on November 13, 2013. On July 11, 2018, the United States District Court for the Southern District of Texas denied Ramey's petition and denied Ramey's request for a certificate of appealability ("COA"). Ramey now applies to this court for a COA. This court has jurisdiction under 28 U.S.C. §§ 1291 and 2253 to consider whether a COA should issue. Ramey contends that a COA is appropriate so that this court can properly consider: (1) whether Ramey's trial was tainted by the exclusion of black jurors (the "*Batson* Claim"); (2) whether trial counsel rendered unconstitutionally ineffective assistance before

trial and during the guilt phase of trial (the "*Strickland* Guilt Phase Claim"); and (3) whether trial counsel rendered unconstitutionally ineffective assistance during the sentencing phase of trial (the "*Strickland* Mitigation Phase Claim"). We GRANT Ramey's application for a COA on his *Batson* Claim and *Strickland* Guilt Phase Claim. We DENY Ramey's application for a COA on his *Strickland* Mitigation Phase Claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case have been detailed elsewhere. *Ramey v. Davis*, 314 F. Supp. 3d 785 (S.D. Tex. 2018); *Ramey v. State*, No. AP-75,678, 2009 WL 335276 (Tex. Crim. App. Feb. 11, 2009). Therefore, we provide only a brief exposition here. On December 17, 2005, the State of Texas indicted Ramey for capital murder, charging him for the murders of three individuals in Jackson County, Texas. A Texas jury found Ramey guilty of capital murder. Following the sentencing phase of the trial, the jury answered Texas's special issue questions in a manner requiring imposition of the death penalty.

Ramey, through the same counsel who represented him at trial, appealed directly to the Texas Court of Criminal Appeals. On February 11, 2009, the Texas Court of Criminal Appeals affirmed Ramey's conviction and sentence. *Ramey*, 2009 WL 335276. Through separate, appointed counsel, Ramey also filed a state application for a writ of habeas corpus. The same judge who presided over Ramey's trial adjudicated his state habeas application. *Ramey*, 314 F. Supp. 3d at 796. The judge entered an order recommending that the Texas Court of Criminal Appeals deny habeas relief. *Id.* at 796. After setting the case for submission, the Texas Court of Criminal Appeals denied Ramey's request for habeas relief on November 7, 2012. *Ex parte Ramey*, 382 S.W.3d 396, 398 (Tex. Crim. App. 2012). On December 4, 2012, the Texas Court of Criminal Appeals issued its mandate.

No. 18-70034

On November 14, 2013, Ramey filed a federal petition for a writ of habeas corpus that listed five claims and "incorporate[d] into his claims for relief the claims filed in his direct appeal brief and in his state habeas application." After his initial federal habeas counsel withdrew and new federal habeas counsel was appointed, Ramey amended his filing on December 15, 2015, raising six additional claims. On July 11, 2018, the district court denied relief and denied a COA.

## II. TIMELINESS OF RAMEY'S PETITION

The State first contends that Ramey's federal habeas petition, filed on November 14, 2013, was untimely because he filed it more than one year after the Texas Court of Criminal Appeals' November 7, 2012 denial of Ramey's state habeas petition. The district court held that the one-year limitations period did not begin running until the mandate issued, which means Ramey had until December 4, 2013 to file his federal habeas petition. The district court also held that the *Batson* Claim, the *Strickland* Guilt Phase Claim, and the *Strickland* Mitigation Phase Claim all relate back to Ramey's federal habeas petition filed on November 14, 2013. We agree with the district court.

AEDPA "enacted a one-year period of limitation for federal habeas proceedings that runs, unless tolled, from the date on which the petitioner's conviction became final at the conclusion of direct review . . . " *Cantu-Tzin v. Johnson*, 162 F.3d 295, 298 (5th Cir. 1998). This one-year limitations period is tolled while an application for state post-conviction relief is "pending." 28 U.S.C. § 2244(d)(2). Here, the question is whether, in a capital case set for submission, a matter is "pending" after the Texas Court of Criminal Appeals renders its opinion but before that court issues its mandate.

We look to Texas's "post-conviction procedures to determine . . . when state review ended." *Watts v. Brewer*, 416 F. App'x 425, 428 (5th Cir. 2011)

3

No. 18-70034

(cleaned up). The Supreme Court has held that we must determine "[w]hen the state courts have issued a final judgment on a state application" to decide if "it is no longer pending." *Lawrence v. Florida*, 549 U.S. 327, 334 (2007).

While this court has held that a Mississippi habeas petition remains pending until the mandate issues, *Watts*, 416 F. App'x at 430, this court has not determined whether the same rule applies in Texas. In Texas, the issuance of the mandate in cases set for submission signals that "the judgment [is] final." *Hartfield v. Thaler*, 403 S.W.3d 234, 239 (Tex. Crim. App. 2013); *see also Ex parte Webb*, 270 S.W.3d 108, 109 n.2 (Tex. Crim. App. 2008) (recognizing that issuance of a mandate in Texas is "an appellate court's official notice, directed to the court below, advising it of the appellate court's decision and directing it to have the appellate court's judgment duly recognized, obeyed, and executed."); *Ex parte Johnson*, 12 S.W.3d 472, 473 (Tex. Crim. App. 2000) (explaining judgment is not final before issuance of the mandate). The issuance of the mandate is particularly important in Texas capital habeas procedure. If a capital case is "filed and set for submission," Texas criminal procedure prohibits a lower court from setting an execution date until "the court of criminal appeals issues a mandate." Tex. Code Crim. Pro. Art. 43.141(a)(2).

The State's focus on *Ott v. Johnson* is misplaced. There, we addressed whether the one-year limitations period should be tolled during the ninety days that a state habeas applicant has to seek a writ of certiorari from the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999). We held that a Texas habeas "application becomes final after a decision by the state's high court." *Id.* However, that case did not involve a capital habeas petition that had been *set for submission* by the Texas Court of Criminal Appeals, meaning that no mandate would issue at all.

For these reasons, we affirm the district court's denial of the State's procedural challenge to the timeliness of Ramey's November 14, 2013 habeas

petition. We embrace the district court's narrow holding on this issue: "[I]n a capital habeas case set for submission, a case is pending for the purposes of section 2244(2) until the Texas Court of Criminal Appeals issues a mandate." *Ramey*, 314 F. Supp. 3d at 800.

## III. SUBSTANTIVE DEFICIENCIES IN RAMEY'S PETITION

The State next contends that Ramey's federal habeas petition, as filed on November 14, 2013 (the "Skeletal Petition"), was deficient because it "failed to adequately address any claim." The State argues that the Skeletal Petition was not a "petition" at all because it did not comply with Rule 8 of the Federal Rules of Civil Procedure. The State also argues that the claims contained in Ramey's amended habeas petition filed on December 15, 2015 do not relate back to the claims in Ramey's Skeletal Petition. The district court rejected the State's argument, holding that the State "concedes" that Ramey's *Strickland* claims relate back. It then held that Ramey's *Batson* claim was incorporated by reference in his Skeletal Petition and that the *Batson* claim in his amended petition related back to the incorporated *Batson* claim. *Id.* Again, we agree with the district court.

*First*, we concur with the district court's finding that the State "concedes" that Ramey's *Strickland* claims relate back to the Skeletal Petition and, therefore, were properly preserved. We note that the State does not challenge the district court's factual finding that the State "concede[d]" its position on these two claims. *See United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) ("[A] party waives any argument that it fails to brief on appeal."). Instead, the State argues on the merits, bypassing the district court's analysis. A failure to identify error in the district court's reasoning constitutes waiver. *See Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999); *Yohey v. Collins*, 985

F.2d 222, 224–25 (5th Cir. 1993); *Brinkmann v. Dallas Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987).

*Second*, we affirm the district court's holding that Ramey's *Batson* claim relates back to the Skeletal Petition. The Supreme Court has made clear that a federal habeas petition that explicitly references external appended documents incorporates those documents by reference. *Dye v. Hofbauer*, 546 U.S. 1, 4 (2005); *see also Allen v. Vannoy*, 659 F. App'x 792, 804–05 (5th Cir. 2016) (reviewing a claim raised during state habeas proceedings and incorporated by reference in federal habeas petition). Ramey incorporated all claims from his direct appeal brief and state habeas application into his Skeletal Petition. Although Ramey's *Batson* claim did not appear in the short list of claims in his Skeletal Petition, it did appear in his prior briefing. Therefore, the question is whether Ramey's *Batson* claim, as pled in his amended petition, is "tied to a common core of operative facts" with the *Batson* claim incorporated by reference into his Skeletal Petition. *Mayle v. Felix*, 545 U.S. 644, 66 (2005); *United States v. Randall & Blake*, 817 F.2d 1188, 1191 (5th Cir. 1987) ("[An] amended complaint relates back if it asserts the same claim 'set forth *or attempted to be set forth*' in the original complaint."). Ramey's amended petition alleges exclusion of black jurors from Ramey's jury, and the Skeletal Petition by incorporation alleges identical claims with similar underlying facts. For example, the Skeletal Petition by incorporation challenged the State's use of the jury shuffle, the State's striking of several black veniremembers, and the State's peremptory strike against Cheryl Steadham-Scott. These allegations are "tied to a common core of operative facts" with the *Batson* claim included in Ramey's amended petition.

The State relies on the Supreme Court's holding in *Baldwin County Welcome Center v. Brown*, 466 U.S. 147 (1984), to argue that Ramey's Skeletal Petition failed to satisfy Federal Rule of Civil Procedure 8. In *Baldwin County*,

the Supreme Court held that a right-to-sue letter sent by the EEOC could not qualify as a "complaint" under Rule 8. *Id.* at 149–50. However, the Court did not announce a rule that claims cannot be incorporated by reference in federal court. Instead, the Court reasoned that the right-to-sue letter did not contain a "statement in the letter of the factual basis for the claim of discrimination." *Id.* By contrast, Ramey's Skeletal Petition incorporates by reference post-conviction briefs that lay out the factual basis for his *Batson* claim.

For these reasons, we agree with the district court that the three claims before us were preserved when Ramey filed his Skeletal Petition.

## IV. DISCUSSION

We will grant a COA upon "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A COA will issue if the applicant shows that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003). Thus, a COA should issue if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner." *Id.* at 336 (quoting *Slack*, 529 U.S. at 484). Importantly, "a COA does not require a showing that the appeal will succeed. . . . [A] COA will issue in some instances where there is no certainty of ultimate relief." *Miller-El*, 537 U.S. at 337.

"AEDPA requires federal district courts to give deference to state court decisions." *Davila v. Davis*, 650 F. App'x 860, 868–69 (5th Cir. 2016), *aff'd*, 137 S. Ct. 2058 (2017). "At this stage, however, [this court] only ask[s] whether the District Court's application of AEDPA deference, as stated in SS 2254(d)(2) and (e)(1), . . . was debatable amongst jurists of reason." *Miller-El*, 537 U.S. at 341.

We conduct a "threshold inquiry into the underlying merit" of Ramey's habeas claims to determine whether a COA should issue. *Miller-El*, 537 U.S. at 327. This inquiry "does not require full consideration of the factual or legal bases" of the claims. *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005). We need only consider "if the District Court's decision was debatable." *Rhoades v. Davis*, 852 F.3d 422, 427 (5th Cir. 2017). When a prisoner faces death, "'any doubts as to whether a COA should issue must be resolved' in the petitioner's favor." *Id.* (quoting *Allens v. Stephens*, 805 F.3d 617, 625 (5th Cir. 2015)).

Ramey contends that a COA is appropriate so that this court can properly consider his *Batson* Claim, his *Strickland* Guilt Phase Claim, and his *Strickland* Mitigation Phase Claim. We conclude that Ramey is entitled to a COA on his *Strickland* Guilt Phase Claim and *Batson* Claim, but we reject Ramey's application for a COA on his *Strickland* Mitigation Phase Claim.

*A.* Batson *Claim*

Ramey contends that the district court erred when it denied his *Batson* claim. Although the district court gave a detailed analysis of this issue, we conclude "that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El*, 537 U.S. at 327. Therefore, we grant a COA on this issue.

Claims challenging the use of race-based peremptory strikes require the application of *Batson*'s three-step test. A defendant must first make a prima facie case that race motivated the challenged strikes. *Batson v. Kentucky*, 476 U.S. 79, 96–97 (1986). If the defendant carries this burden, a prosecutor must provide race-neutral reasons for the challenged strikes. *Id.* at 97–98. Finally, the trial court or reviewing court considers whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98. Here, we bypass step one because the prosecutor volunteered a race-neutral explanation for the peremptory strike at issue. *Hernandez v. New York*, 500 U.S. 352, 359 (1991)

("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

We need only conduct a "preliminary, though not definitive" consideration of Ramey's *Batson* claim. *Miller-El*, 537 U.S. at 338. "In the context of the threshold examination in this *Batson* claim the issuance of a COA can be supported by any evidence demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based." *Id.* at 340. "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[1] *Id.* at 327.

The State used one peremptory strike to strike a black juror, Ms. Steadham-Scott. At the time of the strike, no objection was proffered. Ramey's trial counsel did not object to the State's peremptory strike of Ms. Steadham-Scott until three weeks after the strike was exercised and only moments before the jury was sworn. The objection and subsequent exchange were the following:

> Dr. Willie [Ramey's trial counsel]: And the last thing, Your Honor, just for a housekeeping matter, when we were doing the voir dire on the jury and the supplemental panel, juror number two, which is Cheryl Steadham-Scott was peremptorily struck by the prosecution and we were

---

[1] The State argues that we should apply a more stringent standard to Ramey's *Batson* claim, relying on *Hoffman v. Cain*, 752 F.3d 430 (5th Cir. 2014), among other cases. But *Hoffman* involved this court's review of a district court's denial of federal habeas relief and *grant* of a COA. *Id.* at 434. Other cases cited by the State for a heightened standard did not involve review of an application for a COA, *see, e.g.*, *Felkner v. Jackson*, 562 U.S. 594, 598 (2011), but instead involved review of substantive federal habeas petitions. *See generally* *Miller-El*, 537 U.S. 322 (2003).

just wanting to note that the prosecution did not give any race neutral explanations for that and we just so want that for the record.

Mr. Bell [the prosecutor]: Well, there wasn't any Batson claim, Your Honor. Had there been a Batson claim made at the time, I would have certainly addressed that issue with the Court. I was prepared to address the race neutral reasons for that strike, but to request it at this time, I don't want to say it's untimely, but it is. But, I mean, I was prepared to do that, but there was never a motion for that, Your Honor, so.

The Court: Do you have your notes on that juror?

Mr. Bell: No, not with me, Your Honor.

The Court: It was my recollection of that juror that there was [*sic*] some issues that the State went into that would give rise to a peremptory strike. I don't have those notes in front of me. I wasn't prepared to do that today.

Mr. Bell: I wasn't either, Your Honor, but the reason I didn't go ahead, I will tell the Court that it was my understanding if I would have continued to pursue the line of questioning, that juror would have most likely be challengeable for cause, but I didn't do it because her questionnaire clearly indicated that she could not impose the death penalty and there were other many racially neutral reasons and, if the Court wants, I can try to go back and resurrect those notes.

The Court: I'm comfortable with the record reflecting what it did with respect to that juror at this time.

In the juror questionnaire cited by the prosecutor, Ms. Steadham-Scott did not respond to the question "Have you ever been opposed to the death penalty?" However, Ms. Steadham-Scott did respond that she was "neither generally opposed to nor generally in favor of capital punishment."

Then, during oral questioning about her questionnaire answers, Ms. Steadham-Scott asserted ambivalence about the death penalty, stating "Yea. I don't know how I would change it, but—I don't know how I would change it." When asked if she believed in the death penalty, Ms. Steadham-Scott

responded "I don't know if I believe in it, you know." Ms. Steadham-Scott was then asked a series of questions about Texas's special issue jury questions. That exchange follows:

> Mr. Bell: I'm just asking you would you want a greater amount of evidence or a greater burden to impose a punishment in a death penalty case than in a theft case?  I don't know. I'm just asking you.
>
> Ms. Steadham-Scott: Yes.
>
> Mr. Bell: Okay. Let me ask you about – I'm going to show you how the death penalty works.
>
> Ms. Steadham-Scott: Okay.
>
> Mr. Bell: And I'll do it as quickly as I can. All right?
>
> Ms. Steadham-Scott: That's fine.
>
> Mr. Bell: If – if you find somebody guilty of capital murder --
>
> Ms. Steadham-Scott: Okay.
>
> Mr. Bell: -- they can only get life or death.
>
> Ms. Steadham-Scott: Okay.
>
> Mr. Bell: And the way they get the death penalty is you don't write life or death.
>
> Ms. Steadham-Scott: Okay.
>
> Mr. Bell: You answer two questions.
>
> Ms. Steadham-Scott: Okay.
>
> Mr. Bell: Okay? This is the first question. Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant will commit criminal acts of violence that would constitute a continuing threat to society. Now that's a lot of words, so let's stop and think about that?

No. 18-70034

Ms. Steadham-Scott: Uh-huh.

Mr. Bell: What that's asking of the juror is basically do you find he's going to be a danger to society in the future.

Ms. Steadham-Scott: Okay.

Mr. Bell: Okay. Now the way that thing is worded is if you believe beyond a reasonable doubt. Okay?

Ms. Steadham-Scott: Uh-huh.

Mr. Bell: That there was a probability. Probability is simply more likely than not.

Ms. Steadham-Scott: Yes.

\*      \*      \*

Mr. Bell: In order to answer that yes, that he will be dangerous in the future and he could possibly get the death penalty. Not this Defendant, but any defendant. You see?

Ms. Steadham-Scott: Right.

Mr. Bell: They could actually make that decision on just slightly more likely than not.

Ms. Steadham-Scott: Right.

Mr. Bell: You think you could do that? Actually impose a death penalty when the only evidence was that it would be slightly more likely than not or would you want much more of a – of a burden before you would want to impose a death penalty?

Ms. Steadham-Scott: I would need much more of a burden.

Mr. Bell: Okay. I pass the juror.

As quoted, the State offered race neutral explanations for striking Ms. Steadham-Scott. To repeat, at *Batson*'s step two, we only ask whether the State's proffered reasons for the at-issue strike are "not inherently discriminatory." *Rice v. Collins*, 126 S. Ct. 969, 974 (2006). The State's explanation need not be "persuasive, or even plausible." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam)). The State's proffered reasons for striking Ms. Steadham-Scott focused on her ambivalence about her ability to impose the death penalty.

At *Batson*'s step three, we consider the "persuasiveness of the justification" provided by the State. *Id.* (quoting *Purkett*, 514 U.S. at 768). Still, the ultimate burden at *Batson*'s step three "rests with, and never shifts from, the opponent of the strike." *Id.* (quoting *Purkett*, 514 U.S. at 768). In an effort to carry this burden, Ramey points to the circumstances surrounding the State's strike of Ms. Steadham-Scott. Our review of these circumstances gives us reason to believe that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 US. At 327.

*First*, Ramey points to the State's use of a jury shuffle that resulted in less black jurors being questioned during voir dire of the second venire. When asked to explain the reason for the shuffle, the State explained:

> I have individuals here in Victoria who have assisted me in going through the list and given me information about the prospective jurors . . . the overwhelming majority of the folks that they had suggested would be good State's jurors were towards the back of the panel. And so in light of that I requested a shuffle.

The trial judge and every court since then has credited this explanation.

*Second*, Ramey states that "[t]he State used its peremptory strikes to exclude 100% of the qualified black prospective jurors." Although it is true that no black jurors were empaneled, of the nine black veniremembers, six were dismissed for cause, two were dismissed as relatives of Ramey, and only one

was peremptorily struck. *See Woodward v. Epps*, 580 F.3d 318, 339 (5th Cir. 2009) ("For example, if there are only 3 black members of a 100-member venire panel, i.e., 3% black, there is a weaker argument that exclusion of 100% of the black members evidences purposeful discrimination.").

*Third*, more concerning to us, Ramey contends that the State engaged in disparate questioning of black veniremembers. The State acknowledges that it engaged in inquiries of black jurors "designed to ferret out racial bias" related to "perceived mistreatment [by the State] because of race." The State is permitted to challenge jurors for cause and the State is permitted "to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Connors v. United States*, 158 U.S. 408, 413 (1895). In order to ascertain such a bias, the State must be permitted to engage in non-invidious inquiries of veniremembers. But such questions, especially when lopsided, *cannot* be based on race or racial stereotypes. *Miller-El v. Cockrell*, 545 U.S. 231, 241 (2005) (*Miller-El II*) ("[T]he implication of race in the prosecutors' choice of questioning cannot be explained away"); *see also Georgia v. McCollum*, 505 U.S. 42, 59 (1992) ("This Court firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror."); *Flowers v. Mississippi*, 139 S. Ct. 2228, 2247–48 (2019). Here, given the reality that the State questioned black veniremembers markedly differently than white veniremembers, we will benefit from more briefing to determine whether the State proceeded based on racial stereotypes. *Miller-El II*, 545 U.S. at 263; *see also McCollum*, 505 U.S. at 59; *Flowers*, 139 S. Ct. at 2248.

*Fourth*, Ramey urges that a comparative juror analysis reveals that white veniremembers who expressed ambivalence about the death penalty were ultimately empaneled, while Ms. Steadham-Scott was not. The State's

response is two-fold: (1) the questionnaires on which Ramey relies were not included in the state direct appeal record and therefore cannot be relied upon in this federal review to undermine the state court's findings, *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and (2) Ramey must rely on comparisons "across the entire venire panel" to carry out a meaningful comparative juror analysis. We agree that our "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 536 U.S. at 181. However, we have also held in an unpublished opinion that it is acceptable to supplement the record to include "juror cards from the trial . . . to assist in the comparative [juror] analysis." *Hayes v. Thaler*, 361 F. App'x 563, 574 n.8 (5th Cir. 2010); *see also Reed v. Quarterman*, 555 F.3d 364, 375 (5th Cir. 2009) (holding that a federal habeas court can conduct a comparative juror analysis even if state courts did not). At minimum, reasonable jurists could debate whether the juror questionnaires on which Ramey relies are properly considered by this court.

Ramey points to two jurors whom he contends expressed ambivalence or uncertainty about imposing the death penalty in their juror questionnaires similar to that expressed by Ms. Steadham-Scott—Marjorie Jeane and Carol Laza. Texas has not responded to this comparison. Although Ms. Jeane's juror questionnaire indicated that she "ha[d] . . . been opposed to the death penalty," she confirmed during voir dire that she made an error when filling out the form and that she had no opposition to the death penalty. However, Ms. Laza's juror questionnaire indicated that she was uncertain about her ability to impose the death penalty, and during voir dire she could only say that she "hope[d]" she could make a "fair decision" if the law required her to impose the death penalty. Therefore, it is difficult, without further briefing, to assess whether Ms. Laza and Ms. Steadham-Scott are sufficiently distinguishable veniremembers.

Given these circumstances, "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further," *Miller-El*, 537 U.S. at 327, and we grant Ramey's application for a COA on his *Batson* Claim.

B. Strickland *Guilt Phase Claim*

Ramey contends that trial counsel provided ineffective assistance during pre-trial investigation and during the guilt phase of trial. In federal district court, Ramey detailed for the first time specific actions that trial counsel failed to take and tied these actions to the jury's finding against him. Ramey did not exhaust these allegations in state court. In Texas, the Court of Criminal Appeals would apply its abuse-of-the-writ doctrine to prohibit Ramey from raising these unexhausted allegations in a successive state habeas application. *See Coleman v. Thompson*, 501 U.S. 722, 736 n.1 (1991). This reality would normally dictate the application of a federal procedural bar. *Id.* The question, therefore, is whether reasonable jurists can debate whether this procedural bar should be excused. *Id.* at 750 (procedural bar can be excused if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law"). In *Martinez v. Ryan*, the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. 1, 17 (2012). Once a prisoner meets this standard, the prisoner must also show that they were prejudiced by counsel's failure to raise their *Strickland* claim. As we describe below, because "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further," we grant Ramey's application for a COA on this issue. *See Miller-El*, 537 U.S. at 327.

i. Cause

A finding of "cause" that excuses procedural default under *Martinez* is appropriate where "(1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and (4) state law *requires* th at an 'ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.'" *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 17).

Thus, to successfully rely on *Martinez*, Ramey must first show that the underlying *Strickland* claim "is substantial" or that it "has some merit," *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016), and that state "habeas counsel was ineffective" for failing to raise the underlying *Strickland* claim, *Garza*, 738 F.3d at 676. This court has "recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985); *see also Grant v. Lockett*, 709 F.3d 224, 234 (3d Cir. 2013) ("It is beyond the range of professionally reasonable judgment to forego investigation of, and impeachment based upon, . . . evidence [of a prosecution witness's prior criminal history] absent some apparent strategic reason that might explain or excuse counsel's failure.").

Ramey points to evidence that his lead trial counsel, Dr. Joseph Willie, was a practicing dentist who failed to interview key witnesses, conduct an independent investigation, or pursue impeachment evidence. The second and only other member of Ramey's trial counsel team was James Evans, a lawyer who joined Ramey's defense team just before voir dire began. Evans was tasked with cross examining key State witnesses, including the only eyewitness to the

crime, LeJames Norman. Evans conducted these examinations despite the fact that he had "never spoke[n] to or investigated any of the witnesses who testified against Mr. Ramey during the guilt phase of the trial" and spent less than 120 hours preparing for the case outside of the courtroom. Trial counsel's lack of preparation was evident enough that the trial judge offered to assist trial counsel and called several ex parte conferences to express concerns about trial counsel's preparation, noting at one point his concern that "the file hadn't reflected any sort of motions or pleadings indicating, for example, psychologists that may have been hired or mitigation specialists, or investigators, so tell me what you're doing in that regard."

Nevertheless, to demonstrate that his *Strickland* claim "has some merit," Ramey must also show that he was "actual[ly] prejudiced" by trial counsel's allegedly ineffective assistance. *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984). In this regard, again, we deem that "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further," *Miller–El*, 537 U.S. at 327, specifically as to whether Ramey can demonstrate "actual prejudice" as a result of trial counsel's ineffective assistance. *Strickland*, 466 U.S. at 693–94. Proving "actual prejudice" requires a prisoner to "establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 693–94; *see also Adekeye v. Davis*, 938 F.3d 678, 683 (5th Cir. 2019) (prejudice requires showing that "it was 'reasonably likely' the jury *would* have

reached a different result, not merely that it *could* have reached a different result").

Most important would be trial counsel's lack of preparation to impeach and cross examine the witnesses who testified against Ramey. For example, if trial counsel had investigated LeJames Norman—the only eyewitness to the crime—they might have impeached him with his extensive criminal history, pending escape charges, and the State's alleged threats to prosecute Norman's mother leading up to his testimony against Ramey. Trial counsel might have used this information to undermine the credibility of the State's only witness tying Ramey to the crime scene and pegging Ramey as the principal actor. Likewise, trial counsel might have cross examined Gerald Manzanelez about his apparent deal with the State in exchange for testimony against Ramey. Manzanelez's testimony was used to tie Ramey to the guns purportedly used in the crime, yet he faced no cross-examination. In a prosecution without physical evidence directly connecting Ramey to the crime or connecting the recovered guns to the murders, what the jury heard to discredit the numerous and highly incriminating government witnesses could be determinative. Further briefing would assist us to assess if it is reasonably likely their determination of Ramey's guilt—or their conviction of Ramey as a principal rather than a participant—would have been impacted.

Ramey must also show that state "habeas counsel was ineffective" for failing to raise the underlying *Strickland* claim. *Garza*, 738 F.3d at 676. "[S]tate habeas counsel is . . . subject to the same *Strickland* requirement to perform some minimum investigation prior to bringing the . . . state habeas petition." *Trevino*, 829 F.3d at 348. Because there is evidence suggesting that Ramey's state habeas counsel did not conduct an adequate investigation, it is unclear whether state habeas counsel's failure to identify Ramey's *Strickland*

claim as a habeas issue was a strategic decision or evidence of deficient performance.

The remaining requirements of *Martinez* are easily met because the state collateral review proceeding (here, the state habeas proceeding) was the initial review of Ramey's *Strickland* claim. The Supreme Court held in *Trevino* that, although Texas does not *require* an ineffective assistance of trial counsel claim to be raised during initial-review collateral proceedings, Texas procedure "does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 569 U.S. at 428. For these reasons, "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further" with respect to whether the first prong of *Martinez* has been met.   *Miller–El*, 537 U.S. at 327.

ii. Prejudice

Relatedly, we deem the issue "adequate to deserve encouragement to proceed further" with respect to whether Ramey can demonstrate "actual prejudice" as a result of state habeas counsel's failure to pursue his *Strickland* claim. *Id.* at 415; *Martinez*, 566 U.S. at 13. Ramey must show that his state habeas counsel's failure to pursue Ramey's underlying *Strickland* claim prejudiced Ramey. Given the conclusion that reasonable jurists may debate whether Ramey's *Strickland* claim was "substantial"—and therefore whether Ramey was prejudiced by the alleged ineffective assistance of counsel—it necessarily follows that reasonable jurists  would debate whether Ramey was prejudiced by state habeas counsel's failure to raise his *Strickland* claim in state habeas proceedings. Therefore, Ramey satisfies the second part of the *Martinez* inquiry.

We grant Ramey's application for a COA on the issue of whether Ramey's trial counsel provided ineffective assistance during pre-trial investigation and during the guilt phase of Ramey's trial.

C. Strickland *Mitigation Phase Claim*

Finally, Ramey contends that trial counsel provided ineffective assistance during the mitigation and sentencing phase of Ramey's trial. This claim was presented by state habeas counsel to the Texas Court of Criminal Appeals and rejected. Because the claim is not procedurally defaulted, the reasoning from *Martinez* does not apply. The district court reviewed the state court's decision and held the "state habeas court's decision was not contrary to, or an unreasonable application of, federal law." In doing so, the district court followed the Supreme Court's rule in *Pinholster*, 563 U.S. at 182, that federal habeas review "focuses on what a state court knew and did." *See Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012) ("The import of *Pinholster* is clear: because [the] claims have already been adjudicated on the merits, § 2254 limits [federal] review to the record that was before the state court.").

Under *Strickland*, an ineffective assistance of trial counsel claim requires deficient performance and prejudice. *Strickland*, 466 U.S. at 690–92. Deficient performance is conduct that falls below an objective standard of reasonableness. *Id.* at 688. Counsel must conduct a reasonable investigation into a defendant's background in order to make reasonable, strategic decisions about how to present, or whether to present, the mitigation case. *See Wiggins*, 539 U.S. at 521–23. To show prejudice, Ramey must show "a reasonable probability that . . . the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To determine prejudice in the context of mitigation evidence, the reviewing court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. "Our limited review is whether reasonable jurists would debate the district court's decision that the Texas habeas court did not unreasonably apply *Strickland* and *Wiggins*." *Davila*, 650 Fed. App'x at 868. As the federal

district court pointed out, during state habeas review, Ramey complained generally about trial counsel's mitigation efforts without identifying specifically what trial counsel should have done or what mitigating evidence trial counsel should have utilized. Because Ramey did not show what more trial counsel could have done at the mitigation phase, reasonable jurists would not debate the district court's decision to uphold the state court's reasoning.

As the district court noted, Ramey's federal habeas counsel puts forth a much more detailed analysis of what trial counsel could have—and should have—done at the mitigation phase. But when claims have been presented to and ruled on by the state court, we are precluded from considering evidence or information that Ramey did not present there. *Pinholster*, 563 U.S. at 182 (noting that federal habeas review "focuses on what a state court knew and did."). We decline Ramey's invitation to create a *Martinez/Trevino*-like exception to *Pinholster*. We deny Ramey's application for a COA on his *Strickland* Mitigation Phase Claim.

## V. CONCLUSION

We GRANT Ramey's application for a COA on his *Batson* Claim and *Strickland* Guilt Phase Claim. We DENY Ramey's application for a COA on his *Strickland* Mitigation Phase Claim.